**UNITED STATES of America**

v.

**Thomas MAJOR, Defendant.**

**No. 94 Cr. 448 (MGC).**

United States District Court,
S.D. New York.

Jan. 22, 1996.

Mary Jo White, United States Attorney, Southern District of New York by John M. McEnany, Associate United States Attorney, New York City, for U.S.

Peluso & Touger by David Touger, New York City, for Defendant Thomas Major.

## OPINION

CEDARBAUM, District Judge.

Thomas Major moves to suppress statements he made following his arrest and evidence obtained in a search of his office on the ground that the statements and his consent to the search were not voluntary. I held a two-day evidentiary hearing. After considering the evidence presented and evaluating the credibility of the witnesses, I find by a preponderance of the credible evidence that the statements were voluntary, and that the search was reasonable under the Fourth Amendment. Accordingly, the motion is denied.

### Background

Major is a forty-seven-year-old businessman. (Tr. 147.) He has lived in the United States for thirty-nine years and has been a citizen for approximately thirty-four years. (Tr. 147–48.) He completed four years of college, and since approximately 1970 has been in the printing business. (Tr. 179.) Major speaks fluent, unaccented English.

Pursuant to an arrest warrant, on June 24, 1994, United States Customs agents arrested Major for money laundering. The arrest took place at an apartment in New York City which Major used as his business office. He and his family lived elsewhere. It is undisputed that at least one agent had his gun drawn and pointed at Major when the agents entered the office. (Tr. 26; 158–59.) One of the agents advised Major of his *Miranda* rights and told him that cooperation would be to his benefit. Major described his activities in the money laundering scheme, and signed a consent to search form. Major later signed a *Miranda* waiver and a written statement.

Two versions of the details of the circumstances surrounding Major's statements and his consent to the search emerged from the testimony at the hearing. Special Agent Matthew Raffa testified that he read Major his *Miranda* rights from a standard card, and that Major answered that he understood each right. (Tr. 28–30.) Raffa then told Major that he believed it was in Major's "best interest" to cooperate with the agents and told him some of the evidence the government had against him. (Tr. 30–31.) Raffa testified that he told Major "you are facing essentially the rest of your entire life in jail if you were to be sentenced on these [charges against you]." (Tr. 31.) Raffa suggested that Major tell him about his activities and said that if he did so, the agents would inform the prosecutor and the sentencing court of his cooperation. (*Id.*) According to Raffa, Major then described his participation in the money laundering scheme. (Tr. 32.) After Major told his story, Raffa asked for his permission to take certain documents and money out of the office. Raffa testified that Major showed him and Special Agent Deborah Morrisey the location of records, folders, and bags of money, and turned those items over to the agents. (Tr. 35.) Before turning over the money, however, Major asked to speak to Raffa and another agent in "the back room." There he asked the agents "can you give me part of the cash and put it down as a lesser amount?" (Tr. 49–50.) Shortly after Raffa refused his request, Major asked a second time if he could keep some of the money "because I have a lot of bills." Raffa again refused. (Tr. 50–51.)

Raffa testified that he then took Major to agency headquarters while Morrisey and another agent remained to continue searching. Before leaving the office, Major signed a consent to search form. (Tr. 37.) At headquarters, Major read and signed a waiver of rights form. (Tr. 40–44.) Major then gave a second statement, which Raffa wrote down and Major signed. (Tr. 44–48.)

Major's testimony painted a somewhat different picture. Major testified that before advising him of his *Miranda* rights, Raffa told him that "if you don't fully cooperate, you are looking at 30 to 40 years in jail," and that he had ten minutes to decide whether to cooperate. (Tr. 161.) According to Major,

Raffa then read him his rights, but rather than asking after each right if Major understood, Raffa repeated that Major would spend thirty to forty years in jail if he did not cooperate. (Tr. 161, 164.) Raffa then advised Major of the information the government had about his participation and asked him questions. Major testified that although he remembered signing "something," he did not remember what it was and he did not remember signing his statement, the waiver of rights form, or the consent to search form. (Tr. 170.)

Major also testified about his personal background. He testified that in 1956, when he was approximately eight years old, he and his family fled from Hungary because of the anti-Semitism and violence that accompanied the uprising. (Tr. 151–52.) When the family reached the Austrian border, a Russian soldier shot their guide a short distance from where Major was standing. (Tr. 153.) Major testified that this incident left him "petrified" for years. (Tr. 156.) Major also testified that his father, a Holocaust survivor, (Tr. 149–50), impressed upon him that if he were ever in a "confrontational situation, always cooperate to the fullest because you don't know. The most important thing is the preservation of life." (Tr. 156–57.)

Major testified that when the agents entered his office with guns he went "totally blank," (Tr. 161), and that he feared for his life, (Tr. 165). The only thing in his mind, Major testified, was his memory of the shooting at the Austrian border. (Tr. 159.)

Dr. Gershon Goldin, a psychiatrist, also testified at the hearing. He testified that he had treated Major in October of 1994 for psychological and emotional difficulties arising from the June 24 arrest. (Tr. 104.) Dr. Goldin diagnosed Major as suffering from posttraumatic stress disorder. (*Id.*) He stated that in his professional opinion, Major's experience as a child of witnessing the shooting "made him psychologically more vulnerable to emotional trauma," (Tr. 110), and "more likely to be submissive and comply with a demand [by law enforcement officers]," (Tr. 114). Dr. Goldin testified that, on the basis of what Major reported to him, Major was "emotionally frozen" at the time

of his arrest when he felt that his life was in danger. (Tr. 113.)

Major also presented the testimony of Fe Geslani, a former employee who used the office as her residence. Geslani was present when the agents entered the office. She testified that when she entered the main room shortly after the agents had entered, Major's face was white and he looked "blank." (Tr. 138.)

*Discussion*

### A. Major's Statements

 It is well settled that a defendant's confession may be used against him in a criminal proceeding only if that confession is made voluntarily. *Green v. Scully*, 850 F.2d 894, 900 (2d Cir.), *cert. denied*, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). When a confession is obtained by interrogation of a defendant who is in custody, the government must demonstrate that the defendant validly waived his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For statements to be admissible, the defendant must both voluntarily and knowingly waive his rights. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986); *Miranda*, at 444, 86 S.Ct. at 1612 (waiver must be made "voluntarily, knowingly and intelligently"). The standard of voluntariness for a *Miranda* waiver is the same as that for the voluntariness of a confession under the Fifth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 169–70, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

 The Constitution prohibits the use at trial of those confessions that are involuntary in the sense that they were obtained by government coercion. The requirement that coercion be established before a confession will be suppressed rests on the Fifth Amendment, which explicitly provides: "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V. The Supreme Court has observed that "[t]he sole concern of the Fifth Amendment . . . is governmental coercion." *Connelly*, at 169–70, 107 S.Ct. at 523 (citations omitted). In *United States v. Washing-*

*ton*, in which the Supreme Court held that the testimony of a grand jury witness could be used in a later prosecution against him, the Court explained that "far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.... [T]he Fifth Amendment proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'" 431 U.S. 181, 187, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977) (quoting *Michigan v. Tucker*, 417 U.S. 433, 440, 94 S.Ct. 2357, 2361–62, 41 L.Ed.2d 182 (1974)).

 In *Malloy v. Hogan*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment "secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement." 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964). The Supreme Court has held that a confession is involuntary within the meaning of the Due Process Clause only when it results from police coercion. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920–21, 9 L.Ed.2d 922 (1963) (reversing conviction where defendant's confession, admitted at trial, was "not voluntary, but coerced"). In *Connelly*, the Court held that a confession by a defendant who suffered from schizophrenia and who heard voices that commanded him to confess should not have been suppressed because there was no evidence of police coercion in obtaining the confession. The Court explained that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly*, at 165, 107 S.Ct. at 520–21. The Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167, 107 S.Ct. at 522.

 The Second Circuit has held that to determine whether a confession is voluntary, a court must examine the totality of the circumstances surrounding the confession, *see United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991); *Green v. Scully*, 850 F.2d at 901, and that the relevant circumstances include the conduct of the law enforcement officers, the conditions of the interrogation, and the background of the accused, *United States v. Valdez*, 16 F.3d 1324, 1329 (2d Cir.) (citing *Anderson*), *cert. denied*, —— U.S. ——, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994). These circumstances are relevant, however, only as they pertain to the critical issue of whether the law enforcement officers obtained the confession by "overbearing" the defendant's will. *See Lynumn*, 372 U.S. at 534, 83 S.Ct. at 920 (holding "the question in each case is whether the defendant's will was overborne at the time he confessed") (citations omitted).

 Major argues that Raffa's statements that it was in his best interest to cooperate were coercive. There was conflicting testimony about the details of what Raffa said to Major and in what sequence. I did not find Major to be a forthcoming witness and I do not credit his account. I found Raffa to be a credible witness and I accept his version of the manner in which he advised Major of his *Miranda* rights and of his comments to Major. Raffa testified that he read Major his rights from a card, informed him of some of the evidence against him, and told him that it was in his best interest to cooperate. Raffa advised Major that if he were to cooperate, his cooperation would be made known to the prosecutor and the sentencing court. (Tr. 29–31.) These were truthful statements and while they may have presented Major with a difficult and unpleasant decision, they were not coercive.

 Major relies on *United States v. Anderson*, in which the Second Circuit affirmed the suppression of a defendant's confession that was obtained after the interrogating agent told him three times that if he requested an attorney he would not be able to cooperate. 929 F.2d at 100. The court held that those statements were unconstitutionally false and misleading, because an accused person does not have to choose between his constitutional right to a lawyer and cooperating with the police. *Id.* The court distinguished cases in which it had held that statements by interrogating law enforcement officials that cooperation would be in a defen-

dant's best interest did not render subsequent confessions involuntary. *See id.* at 101–02. In a recent case, the Second Circuit reaffirmed its settled view that "statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive." *United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995) (citing *United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974) and *United States v. Ferrara,* 377 F.2d 16, 17–18 (2d Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967)); *see also United States v. Bye,* 919 F.2d 6, 9–10 (2d Cir.1990); *United States v. Tutino,* 883 F.2d 1125, 1138 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Alvarado,* 882 F.2d 645, 650 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990).

 Raffa's statement that Major faced the rest of his life in prison is another matter. This statement was not based on a realistic assessment of the probable punishment for Major's conduct. Such dramatic exaggeration is improper, but Major, unlike Anderson, was not told that he would be penalized for the exercise of his constitutional rights to remain silent and to request counsel. The determination of whether Major's statements were voluntary must be based on consideration of all the surrounding circumstances. In light of all the circumstances, I find that Major's will was not overborne.

 Major places considerable emphasis on one element of his background: his psychological vulnerability. There is evidence that Major's witnessing of the shooting of his family's guide by a Russian soldier may have left him less able to resist the direction or request of law enforcement authorities. There is no evidence, however, that the Customs agents took advantage of Major's unusual susceptibility, or that they were even aware of any special vulnerability on his part. It may be that when the agents entered his office and he saw the guns, Major became "emotionally frozen," as Dr. Goldin testified. (Tr. 113.) But once the guns were put away, Major regained his composure. Raffa hol-

stered his gun and read Major his *Miranda* rights before asking him any questions. (Tr. 57.) Major's bold request that he be permitted to keep some of the seized money reveals a degree of self-possession and a capacity for independently motivated, self-interested action that are inconsistent with an overborne will. I find by a preponderance of the credible evidence that Major's statements were voluntary.

 I find in addition that Major's waiver of his *Miranda* rights was "knowing and intelligent." Raffa advised Major of his rights, and Major stated that he understood each one. Major read and signed a waiver form. After considering all the evidence, including the evidence concerning Major's mental state, I find that he was aware of his rights and understood them.

Upon consideration of the totality of the circumstances surrounding Major's statements, I find by a fair preponderance of the credible evidence that Major's statements were not the result of an overborne will. Major voluntarily and knowingly waived his rights under *Miranda.* Accordingly, the motion to suppress the statements is denied.

### B. Consent to Search

 The Fourth Amendment protects "the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A search conducted pursuant to the defendant's consent is reasonable so long as the consent was not obtained by police coercion. *See United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995). Whether a defendant's consent to search was given voluntarily is determined by consideration of the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

 The Supreme Court has explained that the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991) (citation omitted). In *Jimeno,* the Court held that courts must apply an objective standard for measuring the scope of a person's consent under the Fourth Amendment; courts must determine

what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Id.* at 251, 111 S.Ct. at 1803–04 (citations omitted). The Second Circuit applied *Jimeno* in *United States v. Garcia,* in which it concluded that the voluntariness of a person's consent also must be determined by applying an objective standard of reasonableness. Accordingly, when a defendant argues that the law enforcement officer coerced his consent, "the ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Garcia,* 56 F.3d at 423 (quoting *United States v. Sanchez,* 32 F.3d 1330, 1334 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1119, 130 L.Ed.2d 1082 (1995)).

■ Raffa testified that he told Major that he would like his permission to take documents and money from the office, and that he told Major that he did not have to consent to a search. (Tr. 35.) According to Raffa, Major showed him where the items were located and even handed them to the agents. (*Id.*) Raffa testified that although Major appeared shaken when the agents first entered the office, he soon seemed relaxed and did not "show any visible signs of stress or anything else that would lead me to believe that he was nervous or afraid." (Tr. 34.) Major's testimony contradicted Raffa's testimony; Major testified that the agents never asked permission to search but rather asked questions and demanded that Major open his filing cabinet. (Tr. 165–66.)

I accept Raffa's account. Upon consideration of the totality of the circumstances, I find that Major cooperated with the agents of his own free will, and that in any event the agents had a reasonable basis to believe that Major voluntarily consented to the search. Accordingly, the motion to suppress evidence acquired from the search of the office is denied.

*Conclusion*

For the foregoing reasons, the motion to suppress statements made by Major and evidence obtained in the search of Major's office is denied.

SO ORDERED.