UNITED STATES of America,

v.

Felix BERKOVICH, Defendant.

No. 96 Cr. 221 (JGK).

United States District Court,
S.D. New York.

July 16, 1996.

James J. Benjamin, Jr., Assistant United States Attorney, Southern District of New York, New York City, for the Government.

Leonard Joy, The Legal Aid Society, New York City, for the Defendant.

*OPINION AND ORDER*

KOELTL, District Judge:

The defendant Felix Berkovich has been indicted for an alleged violation of 18 U.S.C. § 1341. The indictment charges that Mr. Berkovich caused a fraudulent request to withdraw funds from a mutual fund account to be sent and delivered by United Parcel Service. Mr. Berkovich now moves pursuant to Fed.R.Crim.P. 12(b)(3) to suppress statements he made during questioning conducted by agents of the Federal Bureau of Investigation (FBI) on November 29 and 30, 1995. The Court conducted an evidentiary hearing on the defendant's motion on July 1, 1996.

Mr. Berkovich presents three arguments in support of his motion to suppress. First, he contends the FBI agents interrogated him even though he requested to speak to a lawyer before signing a waiver of rights form. Second, the defendant argues that his confession was involuntary because it was the product of coercion. Third, the defendant claims that the statements he made on November 30, 1995 should be suppressed under 18 U.S.C. § 3501(c) because they were obtained more than six hours after he was arrested. For the reasons that follow, the defendant's motion to suppress is denied.

**I.**

After considering all of the evidence, including Mr. Berkovich's affidavit and Special Agent Steven Garfinkel's testimony at the suppression hearing, the Court makes the following findings of fact. On Wednesday, November 29, 1995, FBI agents arrested Mr. Berkovich in a room at the Vista Hotel in New York City. (Transcript of July 1, 1996 hearing ("Tr.") at 5, 7.) The FBI had been investigating Mr. Berkovich for a few months, and through its investigation knew that Mr. Berkovich and an FBI confidential informant ("CI") would be meeting in a room at the Vista Hotel that day. (Tr. at 6.) The FBI occupied an adjoining room and monitored and recorded the meeting between the CI and Mr. Berkovich. (Tr. at 6.) The FBI observed the CI give Mr. Berkovich certain funds and saw Mr. Berkovich complete some paperwork for another stock redemption. (Tr. at 7.) At this point, which was approxi-

mately 3 p.m., the FBI agents came through the door connecting the two adjoining hotel rooms and placed Mr. Berkovich under arrest. (Tr. at 7.) The FBI made it appear that the CI was also under arrest, and brought the CI into another room. (Tr. at 7.)

After the arrest, Special Agents Garfinkel, Barry Braun, and William Belke remained in the room with Mr. Berkovich. (Tr. at 10.) The agents searched Mr. Berkovich and then placed him in handcuffs, with his hands behind his back. (Tr. at 7–8.) At this point Special Agent Garfinkel went into the adjoining hotel room for about five minutes to instruct other FBI agents about what to do with the CI. (Tr. at 10.) No interrogation occurred while Special Agent Garfinkel was out of the room. When Special Agent Garfinkel returned to the room where the arrests were made, Mr. Berkovich was seated in a chair. (Tr. at 13.) Special Agent Garfinkel sat on the bed across from Mr. Berkovich. (Tr. at 13.) Special Agent Garfinkel then told Mr. Berkovich not to talk but to listen. (Tr. at 13.) Special Agent Garfinkel advised Mr. Berkovich of the evidence the FBI had against him, using "colorful language" to get his point across, and explained that Mr. Berkovich might want to cooperate with authorities. (Tr. at 13, 16.) Mr. Berkovich was then taken into the adjoining room where he was shown the monitoring equipment in there. (Tr. at 14.) Once Mr. Berkovich was brought back into the room where he was arrested, one of his hands was handcuffed to a chair. (Tr. at 14.)

Special Agent Garfinkel then made additional comments concerning the benefits of cooperation. (Tr. at 14–15.) Special Agent Garfinkel said that this was the best time for Berkovich to cooperate, that once his arrest became public the benefit of his cooperation would be greatly reduced, and that if he cooperated he would be eligible for a 5K1 letter from the Government, which could mean a downward departure under the Sentencing Guidelines. (Tr. at 14–15, 33–34.) Special Agent Garfinkel did not tell Mr. Berkovich that he would have to plead guilty to every federal crime he spoke about to get a 5K1 letter. (Tr. at 34.) Special Agent Gar-

finkel also told Mr. Berkovich that if he did not wish to cooperate, he would be taken to jail and presented before a magistrate the following day. Special Agent Garfinkel testified that he did not believe that it would be possible to present Mr. Berkovich before a magistrate that day because Mr. Berkovich had been arrested late in the day. (Tr. at 49–50.) Special Agent Garfinkel told the defendant that if he cooperated, it would be possible to waive his appearance in front of a magistrate and permit him to go home that night. (Tr. at 15.) Special Agent Garfinkel made no threats or promises to Mr. Berkovich. (Tr. at 15–16.) In addition, it is not disputed that Mr. Berkovich knows English and that he understood what the FBI agents told him. (Tr. at 10.)

After telling Mr. Berkovich about the benefits of cooperation, Special Agent Garfinkel read Mr. Berkovich his *Miranda* rights, which were detailed on FBI form FD–395 (Gov't Exh. 1), wrote in the place, date, and time (New York, 11/29/95, 3:15 p.m.) at the top of the form, and then gave Mr. Berkovich the form to read for himself. (Tr. at 16–17, 40–41.) Mr. Berkovich then inquired about the quality of court-appointed lawyers. (Tr. at 18, 45.) Special Agent Garfinkel told Mr. Berkovich that court-appointed lawyers were generally very good. (Tr. at 18.) Special Agent Garfinkel testified that Mr. Berkovich then stated, "I guess you guys got me," and signed the form around 3:20 p.m. (Tr. at 18–19.) Special Agent Garfinkel then signed the form as a witness, as did Special Agent Belke. (Tr. at 19.) Although there is a space on the form to indicate at what time the form was signed, this space was left blank. (Tr. at 41–42; Gov't Exh. 1.) Special Agent Garfinkel testified credibly that he did not realize that he had left this space blank until he was making copies of the form for this case. (Tr. at 42.) Special Agent Garfinkel testified that the interrogation of Mr. Berkovich commenced after Mr. Berkovich signed the form. (Tr. at 20.)

Mr. Berkovich claims that he told the FBI agents that he needed a lawyer before he signed any papers and that he refused to sign the form. (Berkovich Aff. ¶ 7.) Mr. Berkovich contends that the FBI ignored

these statements and began interrogating him. He claims that he did not sign the formal waiver of his *Miranda* rights until 9 p.m., when the agents allegedly told him he could go home only if he signed the form. (Berkovich Aff. ¶ 7.) Special Agent Garfinkel denies that Mr. Berkovich stated that he needed to speak to a lawyer before he signed the form, and testified that Mr. Berkovich only asked about the quality of court-appointed counsel. (Tr. at 18–20.) Having assessed Special Agent Garfinkel's credibility, I find his testimony to be candid and truthful. Special Agent Garfinkel credibly testified that he would have made a note on the form if Mr. Berkovich had refused to sign it. (Tr. at 37.) I find Special Agent Garfinkel's testimony that Mr. Berkovich signed the form at 3:20 p.m. without asking to speak to a lawyer before he did so to be more credible than Mr. Berkovich's testimony that he refused to sign the form and only signed it after questioning ceased at 9 p.m.

The parties agree that the FBI agents questioned Mr. Berkovich for two or three hours at the hotel. (Tr. at 20–22.) While at the hotel, Mr. Berkovich was offered the opportunity to use the rest room and to have something to eat and drink. (Tr. at 20.) Although the video equipment used to monitor the conversation between the CI and Mr. Berkovich was available, the FBI agents made no effort to tape the interrogation. (Tr. at 52–53.) Around 5 or 6 p.m., the agents drove Mr. Berkovich to the FBI office at 26 Federal Plaza, where they continued to interrogate him until 9 p.m. (Tr. at 22.) During the interrogation, the agents would say such things as "beep; wrong answer; try again" when Mr. Berkovich said things that the agents believed were not true. (Tr. at 54–55.) Special Agent Garfinkel testified that during the interrogation at the FBI office Mr. Berkovich was permitted to use the rest room and was given soda and nuts. (Tr. at 22–23.) Mr. Berkovich was not handcuffed at the FBI office, and at no time during the questioning did he request an attorney. (Tr. at 25.)

At 9 p.m. Mr. Berkovich signed a form waiving his right to be brought promptly before a court. (Tr. at 23–24; Gov't Exh. 2.)

Special Agent Garfinkel read the form to Mr. Berkovich and then had him read it. (Tr. at 24.) The form provided as follows:

I understand that I have a right to be brought before a court as soon as possible so that the charges can be explained to me, so that I may consult with a lawyer, and so that bail may be set. I also know that if I cannot afford a lawyer, the court will appoint one at Government expense.

I would like to cooperate with the Government and would prefer that my arrest not be made known at the present time. I would therefore request that I not be arraigned now. I understand, however, that no other promises have been made to me, and that charges may be brought against me in the future.

(Gov't Exh. 2.) After Mr. Berkovich signed this form, Special Agent Garfinkel signed it as a witness. (Gov't Exh. 2; Tr. at 24.) The agents then told Mr. Berkovich that he should come back to the FBI office at noon the following day with his passport and that he should bring any other evidence he might have that might help in his cooperation. (Tr. at 24–25.)

Mr. Berkovich returned to the FBI office the next day, at which time he was questioned for about one hour. (Tr. at 25–27.) Mr. Berkovich was not handcuffed during this interrogation. (Tr. at 26.) The agents did not read Mr. Berkovich his *Miranda* rights on this day, and Mr. Berkovich did not ask for an attorney on this day. (Tr. at 26–27.) Special Agent Garfinkel credibly testified that the Government sought Mr. Berkovich's cooperation in order to identify possible co-defendants, and that the agents did not realize that there were no co-defendants until they had completed questioning Mr. Berkovich for the hour on the second day. (Tr. at 47, 55–60.)

Mr. Berkovich was first presented before a magistrate judge on Friday, December 1, 1995. (Tr. at 25.)

## II.

Mr. Berkovich first contends that statements he made on November 29 and 30, 1995 should be suppressed because the FBI

agents interrogated him after he requested an attorney. Because the Court credits Special Agent Garfinkel's testimony that Mr. Berkovich did not in fact request an attorney, this first argument must fail.

■■■ *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that an individual who is in custody must be advised of certain rights, including the right to have an attorney present during questioning, before he is interrogated by government agents. Law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. *Davis v. United States,* 512 U.S. 452, ——— ———, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Diaz v. Senkowski,* 76 F.3d 61, 64 (2d Cir. 1996). To cut off questioning after being advised of his rights, the defendant must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at ———, 114 S.Ct. at 2355; *see also Diaz,* 76 F.3d at 64–65. An ambiguous or equivocal reference to an attorney that would cause a reasonable officer only to suspect that the defendant might be invoking the right to counsel does not require the cessation of questioning. *Davis,* 512 U.S. at ———, 114 S.Ct. at 2355; *Diaz,* 76 F.3d at 64. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis,* 512 U.S. at ———, 114 S.Ct. at 2356.

■■■ Here, the Court credits the testimony of Special Agent Garfinkel that Mr. Berkovich asked only about the quality of appointed lawyers and then signed the waiver-of-rights form at 3:20 p.m., before the FBI agents began questioning him. Mr. Berkovich's inquiry concerning the quality of appointed counsel was not an unambiguous request for counsel that a reasonable police officer would understand as such, as *Davis* requires. Indeed, Mr. Berkovich's inquiry is much more ambiguous than the statement made by the defendant in *Davis,* "Maybe I should talk to a lawyer," which was held to be too ambiguous to require the cessation of questioning. *Davis,* 512 U.S. at ———, 114 S.Ct. at 2353. Accordingly, the defendant's motion to suppress his confession on the grounds that the FBI agents questioned him after he requested counsel is denied.[1]

### III.

Mr. Berkovich also moves to suppress statements he made to FBI agents on November 29 and 30, 1995 on the grounds that these statements were not made voluntarily.

■■■ To assess whether an individual voluntarily made statements to the Government, the Court must consider the totality of the circumstances. *Diaz,* 76 F.3d at 65; *United States v. Ruggles,* 70 F.3d 262, 264–65 (2d Cir.1995); *cert. denied,* ——— U.S. ———, 116 S.Ct. 1284, 134 L.Ed.2d 229 (1996); *United States v. Bye,* 919 F.2d 6, 9 (2d Cir.1990); *United States v. Alvarado,* 882 F.2d 645, 649 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). A number of factors are relevant in this inquiry, including the characteristics of the accused, the conditions of interrogation, and the conduct of law enforcement officials. *Diaz,* 76 F.3d at 65; *Ruggles,* 70 F.3d at 265; *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)).

■■■ Here, Mr. Berkovich claims that the conduct of the FBI agents overwhelmed his free will. Mr. Berkovich claims that the agents said they would "help him and even possibly release him" if he cooperated, but would take him to jail if he did not, that the agents gave him only a very short time to decide whether he wished to cooperate, and

---

1. The defendant relies on *United States v. Quiroz,* 13 F.3d 505 (2d Cir.1993). *Quiroz* does not support the defendant's position, however, given the factual findings the Court has made. In *Quiroz,* the defendant refused to sign the waiver form without consulting counsel. That was considered to be a sufficient request for counsel to require that questioning cease. In this case, the Court finds that the defendant did not ask to speak to counsel before signing the form.

the agents confronted him with the evidence against him before reading him his rights.

The Government has proved by a preponderance of the evidence that Mr. Berkovich knowingly and voluntarily waived his *Miranda* rights and freely made statements to the FBI agents. *See Colorado v. Connelly,* 479 U.S. 157, 167–69, 107 S.Ct. 515, 521–23, 93 L.Ed.2d 473 (1986) (government must prove waiver of *Miranda* rights by preponderance of the evidence); *Anderson,* 929 F.2d at 99 (same). There is no evidence that Mr. Berkovich is of below-average intelligence. During the interrogation he was offered food and access to the bathroom. The physical conditions of the interrogation—the hotel room and the FBI office—are not such as to overbear the defendant's will. There are no allegations of any physical mistreatment. *See Diaz,* 76 F.3d at 65 (such circumstances indicate that confession was voluntarily given).

▆ Furthermore, there is no evidence that law enforcement officials acted inappropriately during the interrogation of the defendant. As the Court of Appeals for the Second Circuit has stated repeatedly, "the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation [does not] convert[ ] an otherwise proper encounter between the police and the accused into a coercive and overbearing experience." *Bye,* 919 F.2d at 9–10. Law enforcement agents may tell the defendant about the evidence against him as well as the reasons why he should cooperate. *Ruggles,* 70 F.3d at 265; *Bye,* 919 F.2d at 9–10; *United States v. Major,* 912 F.Supp. 90, 96–97 (S.D.N.Y.1996) (Cedarbaum, J.). " '[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.' " *Bye,* 919 F.2d at 9 (quoting *United States v. Guarno,* 819 F.2d 28 (2d Cir.1987)); *see also Ruggles,* 70 F.3d at 265 (quoting *Bye* ); *Alvarado,* 882 F.2d at 650.

There is no evidence that the FBI agents made any misstatements to Mr. Berkovich "based on unfulfillable or other improper promises [that] might perhaps overbear a defendant's will." *Ruggles,* 70 F.3d at 265. This is not a case like *Anderson* where agents repeatedly made false and misleading statements to the defendant. *Anderson,* 929 F.2d at 100. Although the FBI agent's statements to Berkovich concerning the evidence the Government had against him and the benefits of cooperation "may have presented [the defendant] with a difficult and unpleasant decision," they did not render Mr. Berkovich's confession involuntary. *See Major,* 912 F.Supp. at 95 (finding not coercive statements by law enforcement agent to suspect informing him of evidence against him and stating that it would be in his best interest to cooperate); *see also Ruggles,* 70 F.3d at 264–65.

After considering the totality of the circumstances, the Court finds that the Government has demonstrated that Mr. Berkovich's statements to the FBI on November 29 and 30, 1995 were made knowingly and voluntarily and were not the product of coercion. Moreover, the Court finds that the defendant knowingly and voluntarily waived his *Miranda* rights.

## IV.

▆ Finally, the defendant argues that statements that he made on November 30, 1995 should be suppressed under 18 U.S.C. § 3501(c) because they were made more than six hours after he was arrested.[2]

It is uncontested that when the FBI agents questioned Mr. Berkovich on November 30, 1995, more than six hours had elapsed since he had been arrested, and the defendant had not yet appeared before a magistrate or any judicial official. Rule 5(a) of the Federal Rules of Criminal Procedure ("F.R.C.P.") provides that

> . . . an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without un-

---

2. The defendant does not contend that the delay in his presentment is grounds for the suppression of the November 29, 1995 statements. These statements were made within six hours of his arrest, and when the defendant was sent home at 9 p.m. it was not reasonably possible to bring him before a magistrate judge.

necessary delay before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041. The parties agree that under 18 U.S.C. § 3501(c), it is within the district court's discretion to suppress a confession if that confession is made during interrogation conducted more than six hours after the defendant was arrested, and the delay in bringing the defendant before a magistrate or other judicial officer beyond this six-hour period is unreasonable under the circumstances. *See United States v. Fullwood*, 86 F.3d 27, 31 (2d Cir.1996); *United States v. Perez*, 733 F.2d 1026, 1030 (2d Cir.1984); *see also United States v. Colon*, 835 F.2d 27, 30 (2d Cir.), *cert. denied*, 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988).

■ Here, the Court declines to suppress statements made on November 30, 1995 because the Government has proved by a preponderance of the evidence that the defendant knowingly and voluntarily waived his right to a prompt presentment. *See Connelly*, 479 U.S. at 168–69, 107 S.Ct. at 522–23 (discussing government's burden of proof in suppression motions); *see also* Gov't Exh. 2 (Waiver of Arraignment). Special Agent Garfinkel testified that he read the Waiver of Arraignment form to Mr. Berkovich and that Mr. Berkovich read the form before signing it. This occurred after Mr. Berkovich had already been informed of his *Miranda* rights and had knowingly and voluntarily waived them, and after he had attempted to cooperate with the Government by providing information for six hours. A defendant may waive his right to be presented promptly. *See United States v. Markoneti*, No. CR 92–0169, 1993 WL 180355, at *2 (E.D.N.Y. May 25, 1993), *aff'd*, 52 F.3d 312 (1995); *United States v. Pham*, 815 F.Supp. 1325, 1331 (N.D.Cal.1993). Like the defendant in *Markoneti*, Mr. Berkovich agreed to waive his right to a speedy presentment in an attempt to obtain the benefits of cooperating with the Government. *See Markoneti*, 1993 WL 180355, at *2.

■ The defendant's argument that the waiver form was deceptive is without merit.

The defendant first claims that the waiver form contains a "definite implication that cooperation is out if the defendant goes to court to have a lawyer appointed." Def.'s Supp.Mem. at 3. Although Special Agent Garfinkel testified at trial that cooperation prior to arraignment is often more helpful, nothing in the arraignment waiver form indicates that the defendant would not be able to cooperate with the Government after he appears before a magistrate judge. The defendant also claims that the waiver form falsely implies that there are no charges against him even though a complaint had already been filed against him. The defendant points to the fact that the waiver form states that the undersigned understands "that charges may be brought against [him] in the future." This statement does not, however, suggest that no charges are currently pending against the undersigned. Indeed, the form suggests just the opposite because it states ". . . [the undersigned] ha[s] a right to be brought before a court as soon as possible so that the charges can be explained to [him]. . . ."

Given the totality of the circumstances, including the fact that the defendant's confession on November 30, 1995 was voluntary, that the agent orally explained to the defendant that he had a right to a prompt presentment, that the defendant signed a written waiver of this right, and that there were no circumstances indicating that this waiver was coerced, the Court finds that the defendant knowingly and voluntarily waived his right to a prompt presentment.

■ In addition, the parties agree that the question of whether to suppress a statement given after a delay of more than six hours between arrest and presentment is in the discretion of the Court. *See United States v. Perez*, 733 F.2d at 1035. In this case, as in *Markoneti*, the delay was not unreasonable. The defendant was cooperating with the Government, and the Government attempted to determine whether there were any potential co-defendants, a possibility that was eliminated only after the questioning on November 30, 1995. As Judge Weinstein found in *Markoneti*, "[t]he agents were properly concerned that a public record

of defendant's arrest would inhibit his ability to cooperate effectively. Voluntary delays in arraignment are not unusual or undesirable where a person who is believed to be engaged in criminal activity volunteers to assist the government in catching other criminals." 1993 WL 180355, at *2. Accordingly, the Court declines to exercise its discretion to suppress the defendant's statements made on November 30, 1995.

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is DENIED.

**SO ORDERED.**