**UNITED STATES of America**

v.

**Norman HSU, Defendant.**

**No. 07 CR 1066 (VM).**

United States District Court, S.D. New York.

Dec. 16, 2008.

Alexander J. Willscher, Katherine Anne Lemire, U.S. Attorney's Office, New York, NY, for Plaintiff.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

On October 17, 2008, defendant Norman Hsu ("Hsu") filed a motion to suppress statements and physical evidence pursuant to Rule 12 of the Federal Rules of Criminal Procedure or, in the alternative, for the Court to grant a hearing on the motion. The Government replied to Hsu's motion on October 30, 2008, conceding the need for an evidentiary hearing on Hsu's request to suppress the statements made by Hsu but arguing that there was no need for a hearing regarding the physical evidence. Hsu replied to the government's opposition on November 7, 2008. The Court held an evidentiary hearing on Hsu's motion on December 4, 2008 and December 8, 2008. For the reasons set forth below, Hsu's motion is DENIED.

## I. BACKGROUND [1]

On September 6, 2007, while traveling on a train from San Francisco, California

---

[1]. The factual recitation set forth in this section derives from the criminal complaint in this action, sworn to on September 19, 2007 (the "Complaint"); Martin Cohen's Declaration in Support of Hsu's Motion to Suppress Statements and Physical Evidence, dated October 17, 2008 ("Motion to Suppress"); Norman Hsu's Declaration in Support of his Motion to Suppress Statements and Physical Evidence, dated October 17, 2008 ("Hsu

to Denver, Colorado, Hsu tried and failed to end his own life. According to Hsu, he took a large number of over-the-counter sleeping pills and lost consciousness. He was taken off the train in Grand Junction, Colorado and admitted to St. Mary's Hospital, apparently suffering from acute renal failure.

After learning that there was an outstanding bench warrant for Hsu's arrest in California, local police took custody of Hsu. Later that day, a federal unlawful flight to avoid prosecution warrant ("UFAP") was issued for Hsu's arrest. Local Federal Bureau of Investigation ("FBI") agents, John Piatanesi ("Piatanesi") and Jane Quimby ("Quimby") then took custody of Hsu. Although the status of his custody changed, Hsu was very ill at this time and was not physically moved from his hospital bed. While under federal custody at the hospital, Hsu was shackled to his bed and guarded by a private security firm contracted by the FBI for that purpose.

Upon Hsu's release from the hospital on September 12, 2007, he was driven to the Mesa County Detention Facility (the "Mesa County Jail") by Piatanesi and placed in a holding cell. Before leaving Hsu at the Mesa County Jail, Piatanesi gave his business card to Hsu.

On September 13, 2007, Hsu left two messages on the Grand Junction FBI office answering machine asking Piatanesi to come speak with him at the Mesa County Jail and stating that there was something he forgot to tell him. (Government Ex. 8.) The following morning, September 14, 2007, Hsu called the Grand Junction FBI office again and spoke with Piatanesi.

Hsu repeated his request that Piatanesi come to the jail to speak with him.

Later that morning, Piatanesi and Quimby went to the Mesa County Jail and met with Hsu. Before beginning the interview that followed, Hsu signed an advice of rights form waiving his right to counsel and his right to remain silent. (Government Ex. 1.) Hsu then spoke to the agents for several hours regarding his past business dealings and political fund-raising activities. Hsu also signed consent-to-search forms for his home, office, suitcase, laptop, cell phone and blackberry. (Government Exs. 2, 3, 4, 5, 6.)

## II. *DISCUSSION*

Hsu seeks to suppress from the Government's use at Hsu's trial in this case the statements he made to Piatanesi and Quimby on September 14, 2007, as well as the physical evidence the Government found after obtaining Hsu's consent to search his office, home and personal property. Hsu asserts that any waivers or statements he provided were not voluntary.

### A. *LEGAL STANDARD*

▉ To introduce a post-arrest statement of a defendant, the Government bears the burden of proving by a preponderance of the evidence that the defendant knowingly and voluntarily waived his rights to remain silent and to the assistance counsel under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) before making the statements. *See United States v. Ramirez,* 79 F.3d 298, 304 (2d Cir.1996). The Government may meet

Decl."); the Government's Memorandum of Law in Opposition to Hsu's Motion to Suppress, dated October 30, 2008 ("Government's Opposition"); documentary evidence submitted to the Court during the evidentiary hearing on Hsu's Motion to Suppress,

held on December 4, 2008 and December 8, 2008 (the "Suppression Hearing"); and the transcript of the Suppression Hearing ("Tr."). Except as quoted or otherwise specifically cited, no further references to these sources will be made.

this burden by establishing that the defendant's statement was "truly the product of free choice." *Id.* (*quoting United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991)). Courts assess the voluntariness of defendants' waivers by considering the totality of the circumstances in which they were made. *Green v. Scully*, 850 F.2d 894, 900–01 (2d Cir.1988). This inquiry focuses on three sets of circumstances: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *Id.* at 901–02.

## B. *APPLICATION*

Piatanesi and Quimby testified that they advised Hsu of his right to remain silent and his right to have his attorney present before they began their interview with him on September 14, 2007. (Tr. at 18–20, 130–31.) The agents also testified that Hsu waived those rights and consented to the searches of his home, office and personal property, both verbally and in writing. (Tr. at 19–20, 27, 131, 137.)

Hsu took the stand and testified in his defense at the Suppression Hearing. While Hsu claims to have little memory of the September 14, 2007 interview with Piatanesi and Quimby, he recalls signing some documents that day. (Tr. at 174.) A written waiver of *Miranda* rights and consent forms for the search of Hsu's home, office and personal property, all bearing Hsu's signature and dated September 14, 2007, were admitted into evidence. (Government Exs. 1, 2, 3, 4, 5, 6.) Hsu recognized his signature and initials on those forms. (Tr. at 173–76.) Hsu testified that he "think[s]" the agents did tell him that he had the right to have a lawyer present during the interview. (Tr. at 184.) Hsu also acknowledged that the addresses of his home and office and the descriptions of his personal property listed on the consent to search forms are correct and that he "probably" provided the password to his

cell phone to the agents during the interview. (Tr. at 174–76.)

There does not appear to be any dispute that Hsu signed a waiver of *Miranda* rights form as well as forms consenting to the searches of his property. (Hsu Decl. ¶ 27.) This finding is not the end of the Court's inquiry, however. *See United States v. Paracha*, No. 03 Cr. 1197, 2004 WL 1900336, at *5 (S.D.N.Y. Aug. 24, 2004) ("The fact that a defendant signed a written waiver form may be highly probative but is not by itself dispositive in establishing the voluntariness or involuntariness of a waiver of rights." (internal citations omitted)). Hsu contends that "his will was overborne by the actions of the agents and the conditions of his confinement" (Motion to Suppress ¶ 5), and that his "physical condition and mental status prevented [him] from voluntarily waiving [his] rights and/or consenting to any searches." (Hsu Decl. at ¶ 27.) The Court must determine whether, given the totality of the circumstances surrounding Hsu's waivers, consents and statements, the Government has sufficiently demonstrated that Hsu acted voluntarily.

### 1. *Characteristics of the Accused*

Hsu contends that his "significantly compromised mental and physical condition at the time" of the waivers, renders them invalid. (Motion to Suppress ¶ 11.) Hsu testified that he was very confused and disoriented when he awoke at St. Mary's Hospital. (Tr. at 158.) Hsu recalls very little about his physical condition when he was released from the hospital but stated that he could walk even though he was scared and "still somewhat disoriented." (Hsu Decl. ¶ 13; Tr. at 161.) He had never been to jail before and he was worried he would be left in a holding cell forever. (Tr. at 168, 198.) Hsu testified that on the night before his interview with

Piatanesi and Quimby, he hardly slept because his holding cell was cold, loud and lit the entire night. (Tr. at 168.) He testified that at the time of the interview, he was "very confused," "nervous," "scared," "ashamed," and "not in the right frame of mind." (Tr. at 168, 187.) He explained that he could not recall much of what transpired during that time because he had tried to commit suicide only a week earlier. (Tr. at 187.)

Quimby testified that Hsu was "pretty out of it" and "very ill" on the night he first came to the hospital but by the next morning he had improved and was "coherent." (Tr. at 10.) Piatanesi described observing Hsu's symptoms "dissipate" over the course of his stay in the hospital. (Tr. at 139.) There was a "total change," according to Piatanesi, from Hsu's first night in the hospital to the day he was transferred to the jail when he was engaging in conversations, watching television and eating. (Tr. at 139–40.) On the day of the interview, Quimby testified, Hsu was "very articulate" and "polite." (Tr. at 17–18.)

Dawn Glenn ("Glenn"), the supervisor of mental health at the Mesa County Jail, testified at the Suppression Hearing that she had seen Hsu at least two times during his stay at the jail. (Tr. at 82, 85.) The first meeting occurred on September 13, 2007 at about 1 p.m. and lasted approximately 30 to 45 minutes. (Tr. at 82.) She observed that Hsu did not appear to be confused or experiencing any type of physical discomfort. (Tr. at 83.) Glenn testified that she judged Hsu to have a small amount of anxiety within the normal limits for a person in jail for the first time. (*Id.*)

Glenn next met with Hsu at around 9:00 a.m. on the morning of September 14, 2007. (Tr. at 87.) She observed that he was "less stressed" and "less anxious" that day. (*Id.*) He was perfectly oriented and he denied any suicidal thoughts. (*Id.*) Glenn testified that Hsu did not seem con-

fused or exhibit any signs of sleep deprivation during this meeting. (Tr. at 89.) She also testified that she tested Hsu's judgment by asking him questions and concluded that his judgment was not impaired. (Tr. at 102, 110–11.) Hsu had been on a suicide watch for the first part of his stay at the jail because he had recently attempted to take his own life, but after evaluating him that morning, Glenn recommended that this watch cease. (Tr. at 87.) At that point, she had determined that Hsu was stable enough to house with the general population. (*Id.*) Sometime later that day, Hsu was transferred to the general population housing, remaining somewhat segregated from the other inmates for his own protection, and given a pillow, blanket, sheets and a regular uniform. (Tr. at 88–89.)

During her testimony, Glenn also explained Mesa County Jail's medical notes on Norman Hsu. (Government Ex. 10; Tr. at 75–76.) The notes reflect not only Glenn's evaluations of Hsu, but the evaluations of other mental health and nursing staff. (Tr. at 76.) The notes also reflect the medications that Hsu was administered while at the jail, including Clonopin, which is taken for anxiety. (Tr. at 95.) When Hsu was first admitted to the jail, he was assessed by a nurse who observed that he was calm and oriented. (Tr. at 77.) At 11:00 p.m. on September 13, Hsu was seen by a night nurse who found him sleeping but observed that he was alert and oriented upon waking. (Tr. at 85.)

Hsu claims that he does not remember his meetings with Glenn, but his testimony did not refute her statements that she found him oriented and stable on September 14 when she met with him one hour before his interview with the FBI agents. (Tr. at 164.) Similarly, he testified that he does not recall much about the interview he had with Piatanesi and Quimby, but his

testimony did not dispute their statements that he was "articulate" and "polite" during their meeting. (Tr. at 166, 174, 184, 199–201, 17–18.)

While Hsu's counsel suggested that the agents' testimony at the Suppression Hearing was not credible and represented a "sanitized version" of the interview, the Court found both agents to be credible witnesses. (Tr. at 210.) The Court also found Glenn's testimony, which corroborated that of the agents in material details, to be credible. On the other hand, Hsu claims that he has no recollection of the substance of anything he said during three hours of the interview, but also claims that he clearly remembers complaining to the agents before the interview began about the conditions of his confinement. (Tr. at 199–201.) Hsu's selective memory of these events casts substantial doubts on the credibility of his testimony. Further, Hsu's assertion that he was weak, sleep-deprived, and confused on the day of the interview is contradicted by the credible testimony of Glenn and the FBI agents as well as the Mesa County Jail's medical notes.

Hsu's counsel attempted to question Glenn on the long-term effects of renal failure, an overdose of sleeping pills and Clonopin may have on a person. (Tr. at 93–96.) Glenn, who is a mental health counselor and not a medical doctor, testified that she was not familiar with the long term effects of renal failure but that, in some cases, Clonopin and overdoses of sleeping pills can affect a person's judgment. (Tr. 93–94, 95–96.) However, Glenn also stated that the effects of an overdose of over-the-counter sleeping pills, the type which Hsu is alleged to have taken, on a patient's cognitive abilities would not last past a few days. (T. at 106.) She also testified that, in her experience, a hospital would not release a patient who was still suffering from disorientation, impaired judgment or cognitive failures six days after an overdose. (Tr. at 108.) Glenn had judged Hsu's judgment to be "fine" on the morning of his interview with the FBI agents. (Tr. at 102.) Therefore, there is no evidence before the Court that supports a finding of Hsu's contention that he was suffering from the effects of the overdose or renal failure that affected his ability to voluntarily waive his rights on September 14, 2007.

Hsu's physical and mental condition on the day of the interview does not rise to the level of significant disorientation or extreme pain that make an overwhelming of a defendant's will more likely. *See Mincey v. Arizona*, 437 U.S. 385, 399–402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (finding statements made by a defendant in the hospital to be involuntary where the defendant was in "unbearable" pain and slipping in and out of consciousness). As the Government highlights in its Opposition, defendants who were responsive, alert and appeared to understand the questions they were asked have been found by the Second Circuit to have waived their rights voluntarily, even where their physical conditions were far more grave than Hsu's condition at the time of his waiver. *See, e.g., United States v. Khalil*, 214 F.3d 111, 115, 121–122 (2d Cir.2000) (statement taken from defendant in hospital, suffering from a gunshot wound and awaiting surgery, found to be voluntary); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.1989) (statements made by defendant while he was in the hospital's ICU, suffering from a knife wound and complaining of dizziness, found to be voluntary). Hsu's long discussion with the agents in which he provided them with names and details regarding his past business dealings (Tr. at 25) are "not consistent with someone who was seriously disoriented or overwhelmed by pain." *United States v. De La Cruz*, No. 05 Cr. 773, 2006 WL 2322692, at * 5 (S.D.N.Y.

Aug. 8, 2006). Lastly, Hsu is a 57–year-old man who is a highly educated, had a long career running various businesses and had been arrested before this incident. (Tr. at 169–72, 198.)

The Court finds nothing revealed in Hsu's characteristics that suggests that he could be overborne by the agents' questioning. *See United States v. Berkovich,* 932 F.Supp. 582, 587 (S.D.N.Y.1996) (finding that a lack of evidence that defendant was of below-average intelligence goes to voluntariness). The Court finds that there is credible evidence on the record before it that Hsu was responsive, oriented and articulate when he made the waivers and, thus, that his mental and physical condition were such that he was able to make a voluntary waiver of his rights.

### 2. *Conditions of Interrogation*

 Hsu complains that the holding cell where he was placed when he came to the Mesa County Jail was "very cold" and he was not given any blankets or pillows. (Hsu Decl. ¶ 16; Tr. at 163.) He testified that he could hear people screaming while he was in the cell and that the light was left on all night, making it hard for him to sleep. (Tr. at 168.)

Glenn explained that Hsu was placed in the holding cell when he first arrived at the jail because he was on suicide watch and the holding cells are easy to monitor. (Tr. at 78–79.) She testified that no inmate on suicide watch is given a blanket or pillow or is placed in a cell with any other inmate because these circumstances increase the likelihood of a suicide attempt. (Tr. at 80–81.) To help keep an inmate on suicide watch warm, he is issued a "suicide prevention gown," which is quilted. (Tr. at 80.) Glenn testified that the holding cell shares the same ventilation system as the rest of the jail, a building which is climate regulated and built only about fifteen years ago. (Tr. at 105.) She further

explained that Hsu, like all of the other inmates, was issued a mattress on which to sleep and that there are not any "beds per se" for the inmates in the Mesa County Jail. *Id.*

Despite Hsu's assertion that he did not sleep in the holding cell, the jail's medical notes indicate that he had slept when the day nurse checked on him on September 13, and that he was sleeping when the night nurse checked on him that night. (Tr. 85, 98–99.) Moreover, Glenn testified that Hsu was not sleep-deprived when she met with him on the morning of September 14. (Tr. 89.) Glenn testified that Hsu did not complain to her about the conditions of the holding cell. (*Id.*)

Although Hsu claims in his Declaration that he was interviewed by Piatanesi and Quimby in the holding cell, he testified at the hearing that he met with them in an interview room at the jail. (Tr. at 185.) Piatanesi and Quimby also testified that they met with Hsu in an interview room. (Tr. at 16, 129.) Quimby testified that the interview room was about ten feet by twelve feet and had a table and at least three chairs. (Tr. at 16.) Both agents recalled taking off Hsu's handcuffs as soon as he entered the interview room. (Tr. at 17, 130, 186.)

The interview began at around 10:00 a.m. and Hsu signed the *Miranda* waiver form at around 10:55 a.m. (Tr. at 142.) The agents testified that during that time, for which there are no contemporaneous notes, they reminded Hsu that they were there at his request and explained his right to counsel and that they could not to discuss his California case or his potential extradition back to California to face those charges. (Tr. at 18–20, 133, 145–46.) Hsu does not specifically recall this discussion but he believes that it was during this time that he complained to the agents about the conditions of the holding cell and asked

them to find out what was going to happen to him. (Tr. at 166–68.) The agents do not recall Hsu complaining about the conditions in the holding cell. (Tr. at 133.) Quimby testified that Hsu agreed to waive his rights and speak with them, and that they had Hsu read each statement on the *Miranda* waiver form aloud and initial it before signing the form at the bottom. (Tr. at 20–21.)

After signing the form, Hsu spoke to the agents about many topics until the three took a break for lunch that lasted approximately 45 minutes to an hour. (Tr. at 136.) Quimby testified that they asked Hsu what he would like to eat and he responded that he would like Burger King. (Tr. at 26.) While Quimby went to buy lunch, Piatanesi waited with Hsu. (Tr. at 26, 143.) He did not question Hsu at that time but instead the pair spoke about their families. (Tr. at 136, 143.) When Quimby returned, they ate their lunch and did not discuss the investigation. (Tr. at 26–27.) Hsu signed the consent to search forms after lunch at 2:45 p.m. (Tr. at 24, 137.) The interview concluded shortly thereafter because Hsu seemed to have run out of topics to talk about; Quimby testified that they did not stop the interview because Hsu was tired or unable to continue. (Tr. at 27–28.)

The Court finds that there is credible evidence that Hsu's holding cell was not unusually cold but, even if it was, the relevance of that allegation may be questionable because Hsu was in the interview room for almost an hour before he signed a waiver, and it was in the interview room, not the holding cell, where he proceeded to provide his statements to the agents during the subsequent three hours. Hsu did not complain about the conditions of the interview room. There is no credible evidence before the Court that the holding cell conditions affected Hsu's ability to make a voluntary waiver of his rights once he was in the interview room.

There is also nothing on the record about the conditions of the interrogation to suggest an overbearing of Hsu's will. *See Berkovich*, 932 F.Supp. at 587 (finding that comfortable interrogation space goes to voluntariness); *United States v. Raposo*, No. 98 Cr. 185, 1998 WL 879723, at *4 (S.D.N.Y. Dec. 16, 1998) (finding defendant's statement voluntary where, among other circumstances, defendant "was kept in comfortable surroundings, and allowed refreshments"). This finding is supported by the fact that after Hsu was transferred from the holding cell to the general population, he again reached out to Piatanesi and Quimby by phone on September 16 and 17, asking that they get back to him because he had "more leads." (Government Ex. 9.)

### 3. Conduct of Law Enforcement Officials

■ Hsu contends that he was overborne by the "actions of the agents." (Motion to Suppress ¶ 5.) There are no allegations that the agents subjected Hsu to badgering or prolonged questioning, physically hurt him, kept him handcuffed, deprived him of food or drink or otherwise mistreated him during the interview. These are the types of circumstances courts have found to indicate coercive behavior on the part of law enforcement. *See, e.g., Green v. Scully*, 850 F.2d 894, 902 (2d Cir.1988).

Hsu testified that the agents said "something" about what they could do regarding the conditions of his confinement, perhaps promising to get him a bed or to try to obtain information about what was going to happen to him. (Tr. at 167, 200–01.) The agents do not recall discussing the conditions of Hsu's confinement with him. (Tr. at 133.) However, even if the agents

promised that they would try to help Hsu with his housing in the jail or obtain information about what would be happening to Hsu, these are not the type of "improper promises [that] might perhaps overbear a defendant's will." *Berkovich*, 932 F.Supp. at 587 (*quoting United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir.1995) (internal quotations omitted)).

The agents came to the jail after receiving three calls from Hsu requesting that they come speak to him and indicating that he had some things he wanted to tell them. (Government Ex. 8; Tr. at 124–25.) Piatanesi and Quimby were not associated with the investigation then being conducted by the FBI in New York and the United States Attorney's office for the Southern District of New York regarding Hsu's businesses and fund-raising activities. Quimby testified that after receiving the messages Hsu left for the agents on September 13, she and Piatanesi reached out to the case agent in New York, Patty O'Connor ("O'Connor"). (Tr. at 13.) On the morning of September 14, Quimby and Piatanesi had a conference call with O'Connor and the Assistant United States Attorney in the Southern District of New York, Boyd Johnson ("Johnson"). (Tr. at 13–14.) During the call they discussed whether or not it was appropriate for the agents to go to the jail to speak with Hsu as he had requested. (*Id.*) They concluded that the agents could speak with Hsu, but would emphasize that he had a right to have his attorney present during the interview and that the agents would not discuss the California matters with him. (Tr. at 14–15.) Piatanesi testified that shortly after the conference call had ended, he received another call from Hsu and they spoke. (Tr. at 124.) Piatanesi recalled that Hsu repeated his request that the agents come speak with him. (*Id.*)

Quimby testified that Hsu was "happy to see [the agents]" when they arrived at the jail and that he was eager to "complete[ly] cooperate." (Tr. at 20, 27.) Hsu was "insistent," according to Quimby, that he wanted to go forward with the interview without his attorney because he had "some things he wanted to talk about" and he was "ready to move things forward." (Tr. at 19.) Piatanesi testified that Hsu was concerned about the impression Hsu's son, Oliver, would be left with after the negative media attention Hsu had received. (Tr. at 143.) Quimby recalled that Hsu spoke to the agents about a number of companies and individuals that she was not familiar with because she was not associated with the New York investigation. (Tr. at 26.) During the lunch break, Quimby called O'Connor, who faxed a list of names of companies and individuals to her that O'Connor wanted the agents to cover with Hsu. (*Id.*) According to Quimby, the interview concluded when Hsu "ran out of things that he could remember ... that he wanted to tell [the agents]." (Tr. at 28.)

The actions of the agents in this case, as well as the circumstances of the interview in question, do not indicate that the agents exerted any pressure on Hsu to confess to any wrongdoing. During the Suppression Hearing, the agents admitted that they were not familiar with the investigation in New York. Before going to the jail to interview Hsu, they discussed with O'Connor and Johnson whether or not they should respond to Hsu's repeated requests that they visit him in jail. There is no indication that they pressed Hsu for information. To the contrary, it appears that Hsu provided "a lot of information" to the agents who were not familiar with the federal investigation in New York and did not understand the importance of the details he was providing. (Tr. at 26.) Accordingly, rather than the interview of Hsu originating from the agents to advance the purposes of the federal investigation, it appears that it was Hsu who prompted the

encounters with the agents to further his own internal motivations, including the desire to improve his relationship with his son.

Hsu's request that the agents come to the jail to speak with them, coupled with his complete cooperation once they arrived, evinces the "demeanor ... of a willing cooperator." *United States v. Shyne*, No. S4 05 Cr. 1067, 2007 WL 1075035, at *27 (S.D.N.Y. Apr. 5, 2007) (agents' testimony that defendant was "very cooperative" and "wouldn't stop talking" went to the voluntariness of defendant's statements). The Court finds that the conduct of the agents was not coercive and did not overwhelm Hsu's ability to make an unconstrained choice.

The totality of the circumstances presented here indicate that Hsu's waivers of his right to silence and counsel, his consent to searches and his statements were made voluntarily. Because the Court finds that Hsu's consent to the searches of his property was voluntary, it does not address the Government's arguments regarding the propriety of those searches regardless of Hsu's consent.

### III. *ORDER*

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion of defendant Norman Hsu ("Hsu") for an order pursuant to Rule 12 of the Federal Rules of Criminal Procedure to suppress statements obtained and physical evidence seized from Hsu by the Government(Docket No. 16) is DENIED.

**SO ORDERED.**