UNITED STATES of America, Appellee,

v.

Oscar QUIROZ, Defendant–Appellant.

No. 171, Docket 93–1216.

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1993.

Decided Dec. 30, 1993.

Susan Corkery, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the Eastern District of New York, Emily Berger, Karen Straus, Asst. U.S. Attys., Brooklyn, NY, on the brief), for appellee.

Joel B. Rudin, New York City, for defendant-appellant.

Before: MESKILL, KEARSE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Oscar Quiroz appeals from a judgment entered in the United States District Court for the Eastern District of New York convicting him, following a jury trial before Carol Bagley Amon, *Judge*, of conspiracy to distribute and to possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841 and 846 (1988). Quiroz was sentenced principally to 188 months in prison and a five-year term of supervised release. On appeal, he contends principally that the district court erred (a) in denying his motion to suppress postarrest statements obtained from him following his request for counsel, (b) in admitting expert testimony and other-crimes evidence at trial, and (c) in calculating his sentence. For the reasons below, we find merit in his first contention, and we vacate the judgment and remand for a new trial.

## I. BACKGROUND

### A. *The Events*

There being no challenge to the sufficiency of the evidence, the government's proof at trial may be summarized briefly. The evidence as to the events leading to Quiroz's arrest was presented principally through the testimony of unindicted coconspirator Jose Teran, also known as Jaime Cordero ("Cordero").

Prior to December 1990, Cordero had met Quiroz and his sister Nancy, a codefendant who has not appealed her conviction, through their brother Ramon. In December 1990, Julio Carillo, an Ecuadorian soccer player, spoke to Cordero of the possibility of importing narcotics into the United States from South America and asked Cordero to contact Quiroz to discuss whether Quiroz would be interested in financing the venture. Cordero arranged to go with Carillo to Quiroz's travel agency, Reynal Travel, to discuss the matter with Quiroz.

At that initial meeting, Carillo told Quiroz that he expected a kilogram of cocaine to arrive from Ecuador on December 26, 1990, and he offered to sell it to Quiroz for $13,000. Carillo informed Quiroz that if this "test" importation proved successful, greater quantities of drugs would be imported in the same way. At a second meeting in December, the parties finalized the terms; Quiroz agreed to advance $10,000 to enable Carillo to obtain the drugs.

On February 15, 1991, Carillo informed Cordero that the shipment had arrived in Jacksonville, Florida, and Cordero relayed that information to Quiroz. Quiroz told Carillo and Cordero to go see Nancy. Nancy, after conferring with Quiroz by telephone, agreed to supply $7,000 of the $10,000 advance, and she gave Carillo airplane tickets to enable him to go to Jacksonville and pick up the drugs. Later that day, Quiroz met Carillo and Cordero and gave Carillo the $10,000. On February 21, Carillo called Cordero to report that the cocaine was ready to be picked up at Carillo's apartment in Manhattan. Cordero went to Reynal Travel, where he spoke by telephone with Quiroz and relayed word of the shipment's arrival. Ramon arrived at the agency and told Cordero there was an urgent need to get the drugs from Carillo because a resale had already been arranged. Ramon drove Cordero to Manhattan, where they met Carillo who took them to his apartment.

Carillo then informed Ramon and Cordero that what had arrived was cocaine base, not cocaine. Ramon called Quiroz to inform him of the "quality of the drugs that had been received," and to ask if he would still accept delivery. After speaking with both Ramon and Carillo, Quiroz agreed to accept the drugs. Ramon and Cordero took the cocaine base and drove off in Ramon's car. Shortly thereafter, the car was stopped by agents of the United States Customs Service ("Customs"), who had been following from the time Cordero and Ramon left Reynal Travel. The agents received consent to search the car and found the cocaine base in the trunk. Ramon and Cordero were placed under arrest.

Thereafter, despite Ramon's requests, threats, and bribe attempt, Cordero eventually implicated Nancy and Quiroz. Quiroz was arrested on June 27, 1991, and charged with conspiracy to distribute and to possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Following his arrest, Quiroz made a statement to Customs Special Agent Richard Dallesandro, denying that he knew Carillo and denying that he had given Carillo or anyone else money in February to purchase narcotics.

### B. *The Motion to Suppress*

Prior to trial, Quiroz moved to suppress his postarrest statements to Dallesandro, arguing that the statements had been obtained in violation of his *Miranda* rights (*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) because they were taken after he stated that he wished to speak with an attorney. The motion was referred to Chief Magistrate Judge A. Simon Chrein, who held an evidentiary hearing at which the government produced the testimony of Dallesandro and Special Agent Jeffrey Larocque of the United States Drug Enforcement Administration ("DEA").

Dallesandro testified that he, one other Customs agent, two DEA agents including Larocque, and one agent from the Internal Revenue Service, had arrested Quiroz pursuant to two warrants, one obtained by the DEA charging him with money laundering and the other obtained by Customs charging him with the present narcotics conspiracy offense. Larocque testified that immediately following the arrest, Quiroz was placed in the DEA agents' van and was read his rights by the other DEA agent. Only Quiroz and the

two DEA agents were present in the van. Quiroz did not ask to speak to an attorney, and he engaged in conversation with the agents on the subject of the money-laundering charge. When asked if he wished to cooperate, Quiroz said he did not as he had done nothing wrong. Quiroz was informed by the DEA agent that there was also a Customs warrant for his arrest on a narcotics distribution conspiracy charge, but the agent did not give him any details. There was no discussion in the van of the events leading to the narcotics conspiracy charge.

Quiroz was then taken to Reynal Travel where the agents executed a search warrant. While there, Dallesandro and the other Customs agent took Quiroz into a back room, told him he was under arrest on the present narcotics conspiracy charge, and had him read printed forms in English and Spanish, each containing a "Statement of Rights" and a section providing for a formal waiver. Dallesandro asked Quiroz whether he understood the forms, and Quiroz nodded affirmatively. Dallesandro asked Quiroz to sign the forms, but Quiroz declined to sign until he had spoken to an attorney. Dallesandro testified:

> After I had asked him if he understood [his rights], I said, would you mind just signing these? He said, I—Before I sign anything, I want to speak to my attorney. Okay, I took them back.

(Suppression Hearing Transcript, October 24, 1991, at 73.) Dallesandro testified that he accordingly wrote on the forms "defendant refused to sign copy until he called his attorney." (*Id.* 74.) Dallesandro then "just asked Mr. Quiroz, I said, would you mind if I ask you a few questions? He said, no, not at all, go right ahead." (*Id.*)

In response to Dallesandro's questions, Quiroz denied knowing Carillo and denied giving anyone money to purchase narcotics. After answering a few more questions, Quiroz said he would answer no further questions as he wished to speak to his attorney. At that point, the questioning ceased.

Cross-examined as to his understanding of Quiroz's request for an attorney, Dallesandro testified:

Q. You understood when he refused to sign the form before speaking to an attorney, that he wanted to speak to an attorney then, didn't you?

A. Yes, sir.

(*Id.* 116.) On redirect examination, he testified:

Q. When the defendant Oscar Quiroz refused to sign the Miranda rights form, what did he say?

. . . .

THE WITNESS: He wanted to speak to his attorney before he signed anything.

Q. And what did you understand him to mean by that statement?

A. That before he signed the Waiver of Rights, that he wanted to ask his attorney if it was all right for him to sign his Waiver of Rights.

(*Id.*)

Dallesandro also testified that prior to the questioning he had asked Larocque whether Quiroz had been read his rights in the DEA van. He said that Larocque informed him that those rights had been read, but that Larocque had not informed him whether Quiroz had requested an attorney or answered any questions. Larocque in effect confirmed that there had been no discussion with Dallesandro of whether Quiroz had requested an attorney or answered any questions; he testified that Dallesandro had not even asked him on the date of the arrest whether Quiroz had been read his rights. Nor did Larocque hear Dallesandro or the other Customs agent seek that information from the other DEA agent.

At the end of the suppression hearing, the magistrate judge recommended that the motion to suppress be denied. He found that Quiroz had refused to sign the waiver form but that he had indicated to the Customs agents that he had no objection to being questioned:

> Now, it is clear to me that the defendant had—that the only statement that the defendant made concerning an attorney before he made the statements in question, which again I emphasize are exculpatory, was not in connection with the continued questioning, but in connection with wheth-

er or not he should sign a Waiver of Rights form. The defendant at no time indicated before making those statements. [*sic*] Whatever he said afterwards, the harm, if any, was done. The defendant at no time indicated that he wanted to speak to a lawyer before speaking to agents. He just said that he wished to speak to a lawyer before signing a Waiver of Rights form.

The first mention of a lawyer was prior to the statements at issue, and the mention of a lawyer was in the context of whether or not he should sign the form. The defendant agreed to be questioned. The defendant answered questions. The answers to his questions were not inculpatory, and those questions are the subject of this motion. Whatever subsequent requests the defendant made for for [*sic*] an opportunity to speak to counsel is [*sic*] irrelevant to the motion to suppress before me, and accordingly I must recommend that the motion be denied.

(*Id.* at 158–59.) The magistrate judge's recommendation to deny the suppression motion was accepted by the district judge, apparently on the grounds stated by the magistrate judge, and Quiroz's statements were admitted at trial.

The jury found Quiroz guilty as charged, and he was sentenced as indicated above.

## II. DISCUSSION

On appeal, Quiroz contends that the district court erred in denying his motion to suppress his postarrest statements and makes a number of challenges to the fairness of his trial and to the calculation of his sentence. We conclude that his postarrest statements should have been suppressed and that the admission of those statements was not harmless error, and we therefore vacate the judgment of conviction and remand for a new trial.

### A. *The Postarrest Statements*

■ Preliminarily, we note that the magistrate judge's emphasis on the fact that Quiroz's statements to Dallesandro were exculpatory is misplaced. A defendant's false exculpatory statement is admissible at trial

to show his consciousness of guilt, *see, e.g.,* *United States v. Nusraty,* 867 F.2d 759, 765 (2d Cir.1989); *United States v. Di Stefano,* 555 F.2d 1094, 1104 (2d Cir.1977), and may be an important part of the government's proof. If the statement was taken in violation of the defendant's constitutional rights, the fact that it was meant to exculpate does not make it any less subject to suppression. *See Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612 ("the prosecution may not use statements, *whether exculpatory or inculpatory,* stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination" (emphasis added)).

■ Quiroz's contention that his constitutional rights were violated poses a close question within the framework established by *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and its progeny. Under *Edwards,* a suspect who has expressed his desire to deal with law enforcement agents only through counsel cannot properly be "subject[ed] to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. at 1633. The *Edwards* Court reasoned that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485, 101 S.Ct. at 1633. The *Edwards* holding was intended to create a rule of "clear, 'brightline' quality," *Michigan v. Jackson,* 475 U.S. 625, 634, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631 (1986), in order "'to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights,'" *Minnick v. Mississippi,* 498 U.S. 146, 150, 111 S.Ct. 486, 489, 112 L.Ed.2d 489 (1990) (quoting *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990)).

■ On the other hand, if the suspect asserts his desire to deal with the authorities through counsel only in part, he may permissibly be questioned in a manner that does not intrude on that partial request for counsel.

*See Connecticut v. Barrett*, 479 U.S. 523, 525, 107 S.Ct. 828, 830, 93 L.Ed.2d 920 (1987). Thus, when a suspect, after receiving *Miranda* warnings, stated that he would not give the police any written statement in the absence of his attorney but volunteered that he had "'no problem'" in talking about the incident, the further questioning by the police did not violate his constitutional rights. 479 U.S. at 525, 107 S.Ct. at 830. The *Barrett* Court stated that a suspect's "limited requests for counsel ... accompanied by affirmative announcements of his willingness to speak with the authorities" should be taken at their face value and do not bar the authorities from questioning him within the limitations he has imposed. 479 U.S. at 529, 107 S.Ct. at 832.

On occasion, it is unclear whether a suspect's statement was intended to invoke his *Miranda* rights in whole or in part. The ambiguity may be the "result of events preceding the request or of nuances inherent in the request itself." *Smith v. Illinois*, 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984) (per curiam). In determining whether a particular suspect's request for counsel was ambiguous, *"postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* (emphasis in original). Moreover, any "[d]oubts must be resolved in favor of protecting the constitutional claim," *Michigan v. Jackson,* 475 U.S. at 633, 106 S.Ct. at 1409, and the courts must "'indulge every reasonable presumption against waiver of fundamental constitutional rights,'" *id.* (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). The courts must also "give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Michigan v. Jackson,* 475 U.S. at 633, 106 S.Ct. at 1409. *See also Connecticut v. Barrett,* 479 U.S. at 529, 107 S.Ct. at 832 (noting that *Barrett* Court was "not denigrat[ing] the 'settled approach to questions of waiver [that] requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel'" (quoting *Michigan v. Jackson,* 475 U.S. at 633, 106 S.Ct. at 1409)). Resolving any doubts in favor of the conclusion that the suspect did

not intend any waiver of his right to consult counsel, the Supreme Court in *Edwards* ruled that the suspect's statement, "I want an attorney before making a deal," 451 U.S. at 479, 101 S.Ct. at 1882, was a sufficient invocation of his *Miranda* rights to require that all questioning cease, *see* 451 U.S. at 487, 101 S.Ct. at 1886. Similarly, in *Minnick v. Mississippi,* in which the suspect said he would make a more complete statement when his lawyer was present, *see* 498 U.S. at 148–49, 111 S.Ct. at 488–49, the Court ruled that he had sufficiently invoked his right to counsel to prevent interim questioning by the authorities, *see id.* at 156, 111 S.Ct. at 492.

In *United States v. Gotay,* 844 F.2d 971 (2d Cir.1988), this Court ruled that when a request for counsel is ambiguous, the authorities may not proceed to interrogate the suspect, though they may ask questions that are narrowly tailored to clarify the scope of the request:

> when a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel.... Under this approach, questions aimed at clarifying a request must be strictly limited to that purpose and may not be used to elicit incriminating information; the police may not use a statement made after an equivocal request but before the request is clarified.
>
> .... [T]he Constitution, *Miranda* and the cases construing it require that we take care that suspects be allowed to invoke their rights freely. Suspects should not be forced, on pain of losing a constitutional right, to select their words with lawyer-like precision.... *Edwards* sought to establish "a bright-line rule to safeguard pre-existing rights." ... Allowing custodial authorities to clarify ambiguous requests will help them, as well as reviewing courts, to determine on which side of the bright line the request falls.

844 F.2d at 975 (quoting *Solem v. Stumes,* 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984)).

In the present case, the government argues that Dallesandro's questioning of Quiroz was permissible on two bases: first, that when Quiroz declined to sign the waiver forms before consulting with counsel, his statement was a limited request to consult with counsel before signing, not a request to consult before answering questions orally, and second, that if Quiroz's statement was ambiguous, Dallesandro's ensuing question, "would you mind if I ask you a few questions," was merely a permissible attempt to clarify the ambiguity. Given the form and scope of Dallesandro's initial request, we reject the contentions that Quiroz's response contained either a limitation or an ambiguity.

Unlike the statement of the suspect in *Barrett*, Quiroz's refusal to give an uncounseled signature was not accompanied by a volunteered statement that he was willing to answer questions orally. Further, under the holding in *Smith*, Quiroz's response to Dallesandro's subsequent inquiry as to whether Quiroz would answer questions orally cannot be used to determine whether his initial response was limited. Looking only at Quiroz's initial statement that he wished to consult with counsel before signing, we do not see any intended limitation, for that statement was a direct and complete response to the precise question Quiroz had been asked.

The government suggests that it was unclear whether or not that initial response was limited because of the events preceding that statement. It points out that Dallesandro's was the second set of *Miranda* warnings given to Quiroz that evening and that Quiroz had freely answered the questions put to him by the DEA agents after their warnings. We might be more receptive to the possibility that the earlier events created some ambiguity concerning the scope of Quiroz's initial request to Dallesandro for counsel if Dallesandro had known that Quiroz had in fact answered some questions without requesting counsel. The record below, however, does not permit an inference that Dallesandro had any such knowledge. According to both Larocque and Dallesandro, Dallesandro was not in the DEA van during or after the DEA agents' warnings, and Dallesandro had no discussion whatever with Larocque or the other DEA agent as to whether Quiroz had requested counsel or agreed to answer any questions.

Nor are we presented with circumstances in which a permissible sequence of questions was put to Quiroz, responses to which revealed an ambiguity as to his intent. For example, if Dallesandro, after having Quiroz read the *Miranda* warnings, had first asked Quiroz orally whether he was willing to waive his rights and received a simple affirmative answer, and had then asked Quiroz to sign the forms and received the response that Quiroz wished to confer with counsel "before [he] sign[ed] anything," we might well have agreed that the latter statement was, in light of the first response, ambiguous.

The record reveals, however, that Dallesandro did not ask Quiroz orally and directly whether he was willing to waive his rights. Rather, Dallesandro asked Quiroz to read the advice-of-rights forms, asked whether he understood the forms, and simply asked Quiroz to sign them. We have no doubt whatever that, had Quiroz signed, Dallesandro would have viewed that act as a complete waiver of Quiroz's rights. We can see no good reason not to treat Quiroz's refusal to sign forms in the absence of counsel as a refusal that was coextensive with the waiver Dallesandro sought.

In sum, we do not view Quiroz's refusal to sign the forms as a limited request for counsel, any more than Dallesandro's request to sign the forms was a request for a limited waiver. Since we do not view Quiroz's statement as narrower than the agent's request, we see no ambiguity. In the absence of ambiguity, further questions by the authorities were prohibited, for there was nothing to clarify. Quiroz's request for counsel should have concluded Dallesandro's questioning. The motion to suppress the statements thereafter obtained from Quiroz should have been granted.

### B. *Harmless–Error Analysis*

When a statement taken in violation of the defendant's *Miranda* rights has been admitted in evidence, the conviction nonetheless need not be reversed if the pros-

ecution shows beyond a reasonable doubt that "there is no ' "reasonable possibility that the evidence complained of might have contributed to the conviction." ' " *United States v. Gotay,* 844 F.2d at 977 (quoting *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963))). An error in admitting evidence that was plainly relevant "cannot ... be conceived of as harmless" if it "possibly influenced the jury adversely." *Chapman v. California,* 386 U.S. at 23–24, 87 S.Ct. at 827–28. To find such an error harmless, we must be able to conclude that the evidence would have been "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt,* 500 U.S. 391, ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). One indicator of the evidence's degree of importance is whether or not the prosecution has emphasized that evidence in its arguments to the jury. *See, e.g., Chapman v. California,* 386 U.S. at 25, 87 S.Ct. at 828 (comment on defendants' failure to testify could not be deemed harmless where "prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly impressed the jury that [the jury could draw inferences of guilt] from the failure of petitioners to testify").

█ In the present case, several factors combine to persuade us that the government has failed to meet its burden of showing that there is no reasonable possibility that the evidence of Quiroz's false exculpatory statements which, as discussed in Part II.A. above, were plainly relevant to show consciousness of guilt, contributed to his conviction. First, the evidence against Quiroz was hardly overwhelming. Other than the false exculpatory statements, the evidence against Quiroz consisted almost entirely of the testimony of Cordero, a witness whose credibility came under severe attack because he did not tell the authorities of Quiroz's involvement in the narcotics conspiracy until several months after his own arrest.

Second, the government repeatedly urged the jury to consider Quiroz's false exculpatory statements, mentioning those statements in its opening, in its summation, and in its rebuttal summation. For example, in her initial summation, the Assistant United States Attorney ("AUSA") described Quiroz's denial that he knew Carillo, despite having Carillo's name and number in Quiroz's address book, and Quiroz's subsequent attempts to get around that false denial; this subject occupies three pages of the trial transcript. The AUSA also advised the jury that "the court will instruct you[ that] if you find that the defendant gave a false statement to divert suspicion from himself, you may infer that the defendant believed that he was guilty." (Trial Transcript 1101.) The court so instructed the jury.

In her rebuttal summation, the AUSA referred again to the false exculpatory statements, making them the climax of her summation against Quiroz:

And last, but not least, there's Oscar Quiroz' own words when he's arrested. What happened? He tells the agents who Julio Carillo, who? El Negro? No, I don't know him. Never heard of him.

Why does he say this? Because he wants to distance himself from the source of the drugs. But he can't. Why? Because it's in his phone books. Negro appears in the phone book, which he states is his own handwriting, which was found on his own person.

(*Id.* 1183–84.)

Finally, we note that even with the false exculpatory statements before it and repeatedly emphasized by the government, the jury, after three days of deliberations, was deadlocked. Only after the court then gave an *Allen* charge (*Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896)) did the jury return a verdict of guilty.

Given the need to shore up Cordero's testimony, the dearth of evidence outside of that testimony, the prosecutor's repeated emphasis on the significance of the false exculpatory statements, and the fact that the jury remained deadlocked after three days of deliberations, we cannot conclude beyond a reasonable doubt that there was no reasonable possibility that the false exculpatory state-

ments might have contributed to the conviction. Accordingly, the error in admitting those statements was not harmless. The judgment of conviction must be vacated and the matter remanded for retrial.

### C. Other Contentions

Quiroz also contends that the trial court erred in admitting "other crimes" evidence of a notebook entry, along with expert testimony regarding that entry, and that the prosecutor's summation was improper. Because the matter is remanded for a new trial, we address these contentions briefly.

Quiroz challenges the admission in evidence of a 1987 appointment book seized from him upon his arrest in June 1991, in which certain entries had been made. He contends that the evidence (a) did not meet the requirements of Fed.R.Evid. 404(b) for the admission of "other acts" evidence, (b) was not relevant, and (c) was not a proper subject for expert testimony. We reject all of these contentions.

■ Quiroz's Rule 404(b) argument is wide of the mark. The government offered the ledger entry as evidence of the narcotics conspiracy alleged in the present indictment, not as evidence of some other crime. As to relevance, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. Determinations of relevance are entrusted to the sound discretion of the trial judge. See, e.g., United States v. Diaz, 878 F.2d 608, 614 (2d Cir.), cert. denied, 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); United States v. Cruz, 797 F.2d 90, 95 (2d Cir.1986). We see no abuse of discretion here. Larocque, qualified as an expert, testified that drug dealers generally keep ledgers recording their drug transactions and usually keep a "running tab" to track the balance of money due on their transactions. He testified that the entry in question appeared to be such a record. Nancy's nickname appeared next to the notation, which was consistent with the testimony that she had put up part of the $10,000 advanced to Carillo. And though the ledger item did not match line-for-line Cordero's description of the February 1991 transaction, there were sufficient points of similarity, including the approximate prevailing wholesale price for one kilogram of cocaine in the area and the amount that Quiroz and Nancy had agreed to advance, that the trial court's ruling that the evidence was relevant could not be considered an abuse of discretion. Points of dissimilarity went to the weight of the evidence, not to its admissibility. See, e.g., United States v. Diaz, 878 F.2d at 615.

■ Nor is Quiroz's challenge to the introduction of expert testimony well taken. The decision whether or not to allow expert testimony rests in the discretion of the trial court. See, e.g., Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (decision of trial court to admit expert testimony must be sustained on appeal unless shown to be "manifestly erroneous"); United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir.1991) (same). We have ruled that the operations of narcotics dealers are a proper subject for expert testimony, so long as the subject matter of the testimony is beyond the normal knowledge of the average juror. See, e.g., United States v. Cruz, 981 F.2d 659, 664 (2d Cir.1992); United States v. Castillo, 924 F.2d at 1232; United States v. Mang Sun Wong, 884 F.2d 1537, 1543 (2d Cir.1989), cert. denied, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990). Matters such as the price of a kilogram of cocaine in New York City and the common practice of drug dealers to keep detailed financial records of their drug transactions, including "running tabs," are appropriate areas for such testimony. Accordingly, we see no abuse of discretion in the admission of expert testimony in the present case.

■ Finally, Quiroz contends that various comments by the AUSA in summation deprived him of a fair trial. By and large, we cannot conclude that the AUSA's comments were inappropriate. We reject Quiroz's contention that the AUSA sought to link him to organized crime by repeated references to "Don" Oscar or "Don" Quiroz. A reference to "Don Oscar" appeared in a book seized

from Reynal Travel, and it was fair argument that the use of the term helped to support the inference that Quiroz was a "big shot," a person who, as Carillo had supposed, had the wherewithal to finance the importation of cocaine. We see no indication that the AUSA sought to link Quiroz to organized crime.

 Nor do we see any impropriety in most of the AUSA's references to the threats Ramon made to Cordero to induce Cordero not to implicate Quiroz and Nancy in the narcotics offense. The court admitted evidence of the threats in order to allow Cordero to explain why he had waited several months after his arrest to implicate Quiroz in the offense. The court properly gave the jury a limiting instruction, advising it that the testimony concerning the threats could be considered only with respect to Cordero's state of mind in delaying giving information to the authorities. Quiroz's attorney, in his summation, made repeated attacks on Cordero's credibility, focusing in particular on his delay in implicating the defendants. Given the importance of Cordero's credibility to the case, the prosecutor had the right to advert to the threats to explain Cordero's delay. We note that the AUSA also went on to state that "a separation order was finally entered in this case which kept the two of them apart, Jaime and the person who was threatening him, Ramon Quiroz, brother of Oscar and Nancy." Though this statement may have gone beyond what was needed to explain the delay, any error was harmless beyond a reasonable doubt.

Quiroz has also made various challenges to his sentence. In light of the vacation of his conviction, we need not reach the sentencing challenges.

## CONCLUSION

For the reasons stated above, the judgment is vacated and the matter is remanded for a new trial.