In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1696

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW L. MARTIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 4:10-cr-40008—**Michael M. Mihm**, *Judge.*

ARGUED OCTOBER 27, 2011—DECIDED DECEMBER 30, 2011

Before FLAUM, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* Law enforcement officers in Warren County, Illinois, arrested Matthew Martin after discovering illegal drugs and a firearm in his vehicle. Shortly after his arrest, Martin was advised of his *Miranda* rights and interviewed by Chief Deputy Bruce Morath of the Warren County Sheriff's Department. At one point during the interview, Deputy Morath asked Martin if he would be interested in providing a written

statement. Martin responded, "I'd rather talk to an attorney first before I do that." Deputy Morath ended the interview and took Martin to the booking area for processing. Approximately two to three hours later, detectives from Burlington, Iowa, arrived at the Warren County Sheriff's Department to interview Martin about a recent robbery. They advised Martin of his *Miranda* rights but were never informed of his prior request to speak to an attorney. Prior to trial, Martin moved to suppress statements he made during this second interview. After an evidentiary hearing, the district court denied his motion. Because we find Martin's invocation of his Fifth Amendment right to counsel was limited to written statements, we affirm the judgment of the district court.

## I. BACKGROUND

On the morning of November 9, 2009, two black males robbed the Farmers & Merchants Bank in Burlington, Iowa. The robbers wore yellow hard hats, tool belts, coveralls, and dust masks to partially conceal their faces. One of the robbers displayed a handgun while forcing a teller to take him to the vault area of the bank. The two men left with approximately $44,000 in cash.

The following day Burlington officers received several tips indicating that one of the robbers might be Daryl Jackson. During an interview with Burlington detectives, Jackson denied any involvement but identified Matthew Martin as one of the robbers. Jackson explained that he and Martin met while incarcerated in Indiana. Martin

contacted Jackson by telephone a couple of weeks prior to the robbery, indicating that he wanted to rob a bank in Burlington. After Martin arrived in Burlington a few days before the robbery, he met with Jackson to discuss his plans in greater detail. Martin described wearing construction equipment during the robbery and told Jackson he had a gun located underneath the hood of his red SUV. Martin called Jackson after the robbery and told him they stole approximately $50,000 in cash.

After interviewing Jackson, Burlington detectives contacted authorities in Indiana to learn more about Martin, including information about any prior robbery convictions. Among other useful information, Indiana police officers provided Burlington detectives with Martin's photograph. His appearance in the photograph was consistent with the bank's surveillance footage. The Burlington detectives' investigation also revealed that Martin stayed at a local Super 8 motel for two nights prior to the robbery. One of the housekeepers at the Super 8 told officers that she observed four black males exiting a room and two of these men were wearing yellow hard hats. The housekeeper positively identified Martin as one of the men wearing a hard hat.

On November 19, 2009, the front desk clerk at the Super 8 contacted Burlington detectives to report that Martin recently checked into the hotel. Burlington detectives began conducting surveillance on Martin and attached a GPS tracking device to his vehicle, a gray Monte Carlo with Illinois temporary tags, registered to Martin's sister.

The following Monday, November 23, 2009, the GPS unit on Martin's car malfunctioned, which prevented detectives from tracking Martin for a short period of time. After the GPS unit resumed proper functioning, Burlington detectives discovered that Martin was driving eastbound in Illinois. The detectives pursued Martin and contacted law enforcement officers in Illinois for additional assistance. Martin entered Warren County, Illinois, before officers were able to conduct a traffic stop. The Warren County Sheriff's Department was apprised of the situation and Chief Deputy Bruce Morath responded to the scene of the traffic stop.

At the time Deputy Morath arrived, officers were conducting a search of Martin's vehicle. The officers discovered small quantities of marijuana and cocaine in the passenger compartment and a silver revolver under the hood of the car.[1] Deputy Morath arrested Martin for possession of a firearm by a felon, possession of cannabis, and possession of a controlled substance. Deputy Morath transported Martin to the Warren County Sheriff's Department.

At the sheriff's department, Deputy Morath read Martin his *Miranda* rights prior to questioning him. Martin acknowledged that he understood those rights and agreed

---

[1] At the suppression hearing, Martin challenged the legality of the officers' search under the hood of the car. The district court found that there was probable cause to search pursuant to *Arizona v. Gant*, 556 U.S. 332 (2009). Martin did not appeal this ruling.

to speak with law enforcement officers. Deputy Morath asked Martin various questions about ownership of the Monte Carlo and Martin's knowledge of the drugs and gun. Deputy Morath stated at the suppression hearing that the sole purpose of his interview was to substantiate the charges brought against Martin based on the items found in his car. Martin admitted he was a convicted felon but denied knowledge of the drugs and gun found in the vehicle. Following these denials, Deputy Morath asked Martin if he would be interested in providing a written statement. According to Deputy Morath's testimony at the suppression hearing, Martin responded, "I'd rather talk to an attorney first before I do that."[2] (Tr. at 106.) Deputy Morath ended the interview and returned Martin to the lock-up. Deputy Morath, whose shift was ending, wrote his report and submitted a copy to the Sheriff and the state's attorney before leaving. He did not speak with the Burlington detectives.

Burlington detectives Schwandt and Thompson arrived at the Warren County Sheriff's Department approximately two to three hours after the traffic stop to question Martin about his involvement in the robbery. They first met with the Warren County Sheriff, who informed them that Martin denied knowledge of the

---

[2] Deputy Morath's report, completed shortly after his interview with Martin, states: "R.O. then asked Martin if he wanted to write a statement of what he knew about the incident. Stated he wanted to talk to an attorney before he did that." (Tr. at 120.)

items recovered from the vehicle. They were not informed, however, that Martin requested to speak with an attorney. The detectives advised Martin of his *Miranda* rights for the second time. Martin again waived these rights and agreed to speak with the two detectives. Martin thereafter admitted that he loaned a gun to Jackson, who returned it to him by placing it under the hood of the vehicle. Detectives Schwandt and Thompson never requested a written statement and Martin did not ask to speak to an attorney during this interview.

## II. ANALYSIS

Martin argues that the statements elicited from him during his interview with the Burlington detectives should be suppressed because he invoked his Fifth Amendment right to counsel prior to this interview. In reviewing the district court's denial of Martin's motion to suppress, we review factual findings for clear error and legal conclusions *de novo*. *United States v. Griffin*, 652 F.3d 793, 797 (7th Cir. 2011).

Law enforcement officers are free to question a suspect who waives his right to counsel after receiving *Miranda* warnings. *Davis v. United States*, 512 U.S. 452, 458 (1994). But a suspect may still invoke his right to counsel after an initial waiver if he does so unambiguously. *See id.* at 458-59. "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, ex-

changes, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The *Edwards* rule is non-offense specific and prohibits police from interrogating a suspect regarding *any* offense after the suspect invokes his *Miranda* rights. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (*citing Arizona v. Roberson*, 486 U.S. 675 (1988)).

Whether a suspect invokes his right to counsel is an objective inquiry which requires, "'at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (*quoting McNeil*, 501 U.S. at 178). If a request is ambiguous or equivocal, police officers may continue questioning a suspect. *Id.*

The *Edwards* rule serves as an absolute prohibition on further interrogation only if an accused invokes his right to counsel for all purposes. *See Connecticut v. Barrett*, 479 U.S. 523, 529-30 (1987); *accord United States v. Spruill*, 296 F.3d 580, 588 (7th Cir. 2002) (suspect's request for an attorney if he took a polygraph exam was a "conditional request"). In *Barrett*, the defendant on three occasions indicated he would not make a written statement without counsel present, but "he had no problem in talking about the incident." 479 U.S. at 525. Upon his arrival at the police station, Barrett was advised of his *Miranda* rights and acknowledged that he understood those rights. *Id.* He stated that he would not give a written statement but would talk to the police officers. *Id.* Thirty minutes later, Barrett was again advised of his rights and acknowledged he understood those rights. *Id.*

He repeated his earlier statement that he would not provide a written statement without an attorney but had "no problem" talking to the officers. *Id.* Barrett then provided an oral confession. *See id.* After police officers discovered their recording device malfunctioned, they advised Barrett of his rights for a third time and Barrett stated that he was still willing to talk but would not put anything in writing until his attorney arrived. *Id.* at 525-26. He then repeated his confession. *Id.* at 526.

The Supreme Court held that Barrett's statements were unambiguous, his intentions were clear, and the police honored those intentions. *Id.* at 529-30. Noting that the proper approach to questions of waiver "'requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel,'" the Supreme Court held that no such interpretation was necessary because the defendant's statements served as an unequivocal waiver of his right to counsel during oral interrogation. *See id.* at 529-30 (*quoting Michigan v. Jackson*, 475 U.S. 625, 633 (1986), *overruled by Montejo v. Louisiana*, 556 U.S. 778 (2009)).

The sole question in this case is whether Martin's statement, "I'd rather talk to an attorney first before I do that," served as an absolute prohibition on further interrogation or was limited in its scope to written statements. The district court held that Martin's statement was unambiguous and "cannot be fairly construed as an unqualified invocation of his Miranda rights." (Tr. at 190.) The district court noted that Martin had previously waived his *Miranda* rights, answered all of

Deputy Morath's questions, and was directly responding to a request to make a written statement at the time he invoked his right to counsel. Thus, given the context, the district court found that Martin's invocation was not an absolute prohibition.

We agree with the district court. Martin's statement is unambiguous in light of the circumstances and is clearly limited to written statements. This case differs from those cases described in *Barrett* requiring a court to give "broad effect to requests for counsel that were less than all-inclusive." 479 U.S. at 529 (*citing Oregon v. Bradshaw*, 462 U.S. 1039, 1041-42 (1983) ("I do want an attorney before it goes very much further."); *Edwards*, 451 U.S. at 479 ("I want an attorney before making a deal.")). Here, Deputy Morath clearly asked Martin if he would provide a written statement. In response, Martin invoked his right to counsel "before I do that." His request for counsel was unambiguous and the phrase "before I do that" operates as a clear limitation of that request. "To conclude that [Martin] invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [Martin's] statement." *Id.* at 529-30.

Martin argues that this case is governed by *Edwards*, not *Barrett*. He asserts that his case differs significantly from *Barrett* in that he never affirmatively expressed a desire to continue speaking with law enforcement officers without an attorney present. We can infer from Martin's actions, however, that he was not unwilling to

do so. At the beginning of the interview, Martin was
apprised of his *Miranda* rights and signed a waiver in-
dicating that he was willing to talk to Deputy Morath.
He freely answered all of Deputy Morath's questions.
At what may be reasonably interpreted as the conclusion
of the interview, Deputy Morath asked Martin if he
would provide a written statement. Martin stated he
would rather talk to an attorney "before I do that." Deputy
Morath ceased questioning, either because the interview
was over[3] or because Martin requested an attorney.
Thereafter, Martin signed an additional waiver of his
*Miranda* rights and agreed to speak with the Burlington
detectives.[4] There is no indication that Martin "did

---

[3] Deputy Morath acknowledged that his purpose in interview-
ing Martin was to elicit statements supporting the drug and
gun charges. This included whether Martin was the driver of
the vehicle and whether he owned the items found within
the vehicle. Prior to Deputy Morath's request for a written
statement, Martin admitted he was the driver of the car
(which belonged to his sister), admitted to being a convicted
felon, and denied knowledge of the drugs and gun located
within the vehicle. Deputy Morath then asked Martin "if he
had anything else to say." (Tr. at 106.) Only after these ques-
tions were asked and answered did Deputy Morath ask
Martin to provide a written statement.

[4] Martin's conversation with the Burlington detectives is
helpful only in supporting the inference that Martin was
willing to speak with authorities. Such evidence cannot
establish that Martin waived his right to counsel. *See Edwards*,
451 U.S. at 484 ("[A] valid waiver of that right cannot be

(continued...)

not feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney." *Roberson*, 486 U.S. at 684.

As noted in *Barrett*, the prohibition of further questioning after a suspect invokes his right to counsel is intended to prevent police coercion. *See* 479 U.S. at 528. In this case, there is no evidence of mischief by the officers or any indication that Martin was coerced into providing statements to either Deputy Morath or the Burlington detectives. Rather, any alleged error by the law enforcement officers appears to derive from a simple, although troubling, lack of communication. But despite this failure to communicate, Martin did not suffer a constitutional deprivation. His invocation of the right to counsel was clearly limited in its scope to written statements. Martin did not provide a written statement, nor did officers request one, after he invoked his right to counsel.

### III. CONCLUSION

Because Martin's request for counsel was limited to written statements, the judgment of the district court is AFFIRMED.

---

[4] (...continued)
established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights.").

WOOD, *Circuit Judge,* dissenting.  The question before us in this case is whether Matthew Martin's Fifth Amendment rights were violated when law enforcement personnel disregarded his request to speak to an attorney and instead resumed their interrogation of him after initially (and properly) cutting off further questioning. My colleagues find no such violation; in their view, Martin intended to include only written statements in his invocation of his right to counsel. With respect, I cannot join them, because Martin never affirmatively indicated that he was placing any such restriction on his request. The majority's approach drives yet another hole into the protections that the *Miranda* warnings are supposed to afford, and it does so in a way that fails to take into account the realities of the situation that a man like Martin faces. I therefore dissent.

As the majority notes, Martin was arrested on suspicion that he might have been responsible for a bank robbery that took place on November 9, 2009, in Burlington, Iowa. Another man, Daryl Jackson, pointed the finger at Martin, explained that he had met Martin in an Indiana prison, and stated that Martin had told Jackson all about his plans for robbing the bank. The Burlington police naturally followed up on this tip and eventually began tracking Martin using a GPS device after they located him in Iowa. The device revealed that Martin was driving eastbound and had crossed into Illinois, where he was picked up by Chief Deputy Bruce Morath from the Warren County (Illinois) Sheriff's Department. A search of Martin's car revealed small amounts of drugs and a gun; these discoveries

prompted Deputy Morath to arrest Martin on several charges and to transport him to the station.

There, Deputy Morath read Martin his *Miranda* rights, and Martin acknowledged that he understood his rights and was willing to speak with the officers. In response to several questions about his car, the drugs, and the gun, Martin admitted that he was a convicted felon but he denied any knowledge of the drugs and gun that had been found in his car. At that point, Deputy Morath asked Martin if he would be interested in providing a written statement. Martin responded "I'd rather talk to an attorney first before I do that." (In fact, there are a couple of versions of his response in the record, each with a slight variation, but my point does not depend on these nuances, and so I am willing to use the version that the majority has adopted.) In light of Martin's response, Deputy Morath ended the interview and returned Martin to the lock-up. He left the building shortly after that, after writing up a report that noted Martin's request for an attorney and giving a copy of it to the Sheriff and the state's attorney.

If that were the end of the story, we would not have this appeal. But it is not. What happened instead is that two detectives from Burlington, Schwandt and Thompson, showed up at the Sheriff's office a couple of hours after the arrest, wanting to question Martin. They met first with the Sheriff, who told them that Martin had denied knowledge of the drugs and the gun, but who, despite having Deputy Morath's report, failed to mention that Martin had asked to speak with a lawyer.

Schwandt and Thompson thus met with Martin, read him his *Miranda* rights (again), and Martin said that he waived those rights and was willing to speak with them. It was only during this later interrogation, which took place only a few hours after Martin had asked for a lawyer, that Martin admitted that he had loaned a gun to Jackson and that Jackson had placed this gun under the hood of Martin's car.

All of us agree that the critical statement that must be analyzed is the one that terminated Deputy Morath's interview with Martin: According to the best information we have, he said "I'd rather talk to an attorney first before I do that." The majority finds that "[Martin's] request for counsel was unambiguous and the phrase 'before I do that' operates as a clear limitation of that request." *Ante* at 9. I agree with them that Martin's request for counsel was unambiguous. But, stare at it as I might, I cannot see in the words "before I do that" anything approaching a "clear" limitation of his concededly unambiguous request for counsel. As I explain further below, consideration of the totality of the circumstances does not bolster the majority's position—instead, it undermines their argument. Tellingly, the facts here do not come close to meeting the standard that the Supreme Court established in *Connecticut v. Barrett*, 479 U.S. 523 (1987), for a limited invocation of rights. In *Barrett*, the Court first reiterated the rule that once an accused states that he wants an attorney, the interrogation must cease until an attorney is present. See, *e.g.*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). But in

*Barrett*, as the Court put it, the accused's "limited requests for counsel . . . were accompanied by affirmative announcements of his willingness to speak with the authorities." 479 U.S. at 529. Indeed, Barrett had said that he was willing to speak to the police, but that he did not want to make a written statement outside the presence of counsel. *Id.* at 525.

That is a far cry from what we have here. In the statement at issue, Martin never even hinted that he was willing to talk to anyone. All he said was that he would rather talk to an attorney "first." Deputy Morath, by his actions, demonstrated that he understood just what Martin was doing. Deputy Morath properly ended his interrogation, sent Martin back to the lock-up, and prepared to go home. An explanation even more plausible than the one the majority finds "clear" is that Deputy Morath's request for a written statement alerted Martin to the fact that he was in real trouble: the interrogation was getting serious, and Martin needed the assistance of counsel. This is exactly the way that our colleagues in the Second Circuit interpreted a comparable exchange. In *United States v. Quiroz*, 13 F.3d 505, 512 (2d Cir. 1993) (citing *Barrett*, 479 U.S. at 529, overruled on unrelated grounds by *United States v. Plugh*, 648 F.3d 118, 126 (2d Cir. 2011)), the court found that by "[l]ooking only at Quiroz's initial statement that he wished to consult with counsel *before signing*, we do not see any intended limitation, for that statement was a *direct and complete response* to the precise question Quiroz had been asked" (emphasis added). That is, the *Quiroz* court found that an invocation of a right to counsel in response to a direct

question about signing something was an across-the-board assertion of the accused's rights. We should follow the Second Circuit's lead in *Quiroz* and recognize here that Martin, by refraining from saying anything about his willingness to talk in a limited way, placed no limits on his invocation of his rights to remain silent and to receive assistance of counsel.

The majority asserts that "[t]o conclude that [Martin] invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [Martin's] statement." But this loses sight of what Martin said—and of what he did not say. As I have already stressed, in *Barrett*, the accused *unambiguously and affirmatively* consented (three times) to providing oral statements. Nothing of the sort happened in our case. The majority must rest its decision on the thin reed of the final four words in Martin's statement: "before I do that." Do what? Sign a written statement? Talk more? If we are to look at context, then the majority cannot limit its view to Deputy Morath's question; it must also take into account his immediate response to Martin's request, which was to cease interrogation. Looking at everything that was happening at the time Martin made that statement, it is no disregard at all of the "ordinary meaning" of Martin's words to find that he placed no limits on his invocation of his right to counsel.

The majority's rule reverses the presumption reflected in *Barrett*, under which a partial waiver of rights exists only if the accused affirmatively spells out what he will

discuss and what he will not. In so doing, it calls for a result different from the one that the Supreme Court itself reached in *Edwards,* where the request for counsel was conditionally phrased. Recall that after the officer there told Edwards that he had no authority to make a deal, Edwards stated that he "want[ed] an attorney *before making a deal*." 451 U.S. at 479 (emphasis added). The next morning, two officers returned and elicited a confession from Edwards. Under the standard adopted by the majority, that second interrogation would have been permissible: Edwards' request would be limited to conversations about a deal and would not have reached anything about the events underlying his arrest.

The majority also relies on the fact that after the impermissible resumption of his interrogation and the repetition of the *Miranda* warnings, Martin agreed to talk to the Burlington detectives. This, they believe, "support[s] the inference that Martin was willing to speak with authorities." *Ante* at 10 n.4. Although the opinion acknowledges that this evidence cannot be used to establish that Martin waived his right to counsel, *id.,* this does not go far enough. In fact, as *Edwards* holds, it is impermissible to rely on anything Martin said during the second phase of his interrogation. And *Edwards* does not stand alone. In *Smith v. Illinois*, 469 U.S. 91, 100 (1984), the Supreme Court stated that "*postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request" (emphasis in original). Applying *Smith* to *Barrett*, the Second Circuit found that "response[s] to [the police's]

subsequent inquiry as to whether [the defendant] would answer questions orally cannot be used to determine whether his initial response was limited." *Quiroz*, 13 F.3d at 512; see also *Robinson v. Borg*, 918 F.2d 1387, 1391 n.4.

Last, the majority's opinion deals only cursorily with the fact that it is the government's burden to prove Martin waived his right to counsel. *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011). This is important for two reasons. First, it means that ties go to Martin, not to the prosecution. As footnote 2 in the majority's opinion concedes, there is still some question about what exactly Martin said. *Ante* at 5 n.2. Second, the majority suggests that Deputy Morath left the interrogation room because he had reached the "conclusion of the interview," but as it acknowledges, it is equally likely that he ended the conversation because "Martin requested an attorney." *Ante* at 10. We must take the defendant's statements "as ordinary people would understand them," *Barrett*, 479 U.S. at 529, and in that light (as I have already noted), Deputy Morath's own reaction to Martin's statement is instructive. Upon hearing Martin's response, Deputy Morath did not drop the suggestion of a written statement and continue with the oral interrogation. He immediately ceased *all* interrogation without regard to its form. To the extent that the record does not contain enough information to resolve whether Deputy Morath left because he was finished or because of Martin's request for an attorney, it is the government that bears the risk of uncertainty. There is nothing (except Martin's postrequest statements, which we all agree are out of bounds) to show Martin's intent to selectively waive his right to counsel.

Because Martin never affirmatively stated that he was willing to continue to talk to the officers, because the record shows that Deputy Morath realized that Martin wanted interrogation to cease until an attorney arrived for him, and because the majority attributes meaning to Martin's statement that it cannot bear, I respectfully dissent.