WOOD, Circuit Judge,
dissenting.
The question before us in this case is whether Matthew Martin’s Fifth Amendment rights were violated when law enforcement personnel disregarded his request to speak to an attorney and instead resumed their interrogation of him after initially (and properly) cutting off further questioning. My colleagues find no such violation; in their view, Martin intended to include only written statements in his invocation of his right to counsel. With respect, I cannot join them, because Martin never affirmatively indicated that he was placing any such restriction on his request. The majority’s approach drives yet another hole into the protections that the Miranda warnings are supposed to afford, and it does so in a way that fails to take into account the realities of the situation that a man like Martin faces. I therefore dissent.
As the majority notes, Martin was arrested on suspicion that he might have been responsible for a bank robbery that took place on November 9, 2009, in Burlington, Iowa. Another man, Daryl Jackson, pointed the finger at Martin, explained that he had met Martin in an Indiana prison, and stated that Martin had told Jackson all about his plans for robbing the bank. The Burlington police naturally followed up on this tip and eventually began tracking Martin using a GPS device after they located him in Iowa. The device revealed that Martin was driving eastbound and had crossed into Illinois, where he was picked up by Chief Deputy Bruce Morath from the Warren County (Illinois) Sheriffs Department. A search of Martin’s car revealed small amounts of drugs and a gun; these discoveries prompted Deputy Morath to arrest Martin on several charges and to transport him to the station.
There, Deputy Morath read Martin his Miranda rights, and Martin acknowledged that he understood his rights and was willing to speak with the officers. In response to several questions about his car, the drugs, and the gun, Martin admitted that he was a convicted felon but he denied any knowledge of the drugs and gun that had been found in his car. At that point, Deputy Morath asked Martin if he would be interested in providing a written statement. Martin responded “I’d rather talk to an attorney first before I do that.” (In fact, there are a couple of versions of his response in the record, each with a slight variation, but my point does not depend on these nuances, and so I am willing to use the version that the majority has adopted.) In light of Martin’s response, Deputy Morath ended the interview and returned Martin to the lock-up. He left the building shortly after that, after writing up a report that noted Martin’s request for an attorney and giving a copy of it to the Sheriff and the state’s attorney.
If that were the end of the story, we would not have this appeal. But it is not. What happened instead is that two detec *691 tives from Burlington, Schwandt and Thompson, showed up at the Sheriffs office a couple of hours after the arrest, wanting to question Martin. They met first with the Sheriff, who told them that Martin had denied knowledge of the drugs and the gun, but who, despite having Deputy Morath’s report, failed to mention that Martin had asked to speak with a lawyer. Schwandt and Thompson thus met with Martin, read him his Miranda rights (again), and Martin said that he waived those rights and was willing to speak with them. It was only during this later interrogation, which took place only a few hours after Martin had asked for a lawyer, that Martin admitted that he had loaned a gun to Jackson and that Jackson had placed this gun under the hood of Martin’s car.
All of us agree that the critical statement that must be analyzed is the one that terminated Deputy Morath’s interview with Martin: According to the best information we have, he said “I’d rather talk to an attorney first before I do that.” The majority finds that “[Martin’s] request for counsel was unambiguous and the phrase ‘before I do that’ operates as a clear limitation of that request.” Ante at 689. I agree with them that Martin’s request for counsel was unambiguous. But, stare at it as I might, I cannot see in the words “before I do that” anything approaching a “clear” limitation of his concededly unambiguous request for counsel. As I explain further below, consideration of the totality of the circumstances does not bolster the majority’s position — instead, it undermines their argument. Tellingly, the facts here do not come close to meeting the standard that the Supreme Court established in Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), for a limited invocation of rights. In Barrett, the Court first reiterated the rule that once an accused states that he wants an attorney, the interrogation must cease until an attorney is present. See, e.g., Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). But in Barrett, as the Court put it, the accused’s “limited requests for counsel ... were accompanied by affirmative announcements of his willingness to speak with the authorities.” 479 U.S. at 529, 107 S.Ct. 828. Indeed, Barrett had said that he was willing to speak to the police, but that he did not want to make a written statement outside the presence of counsel. Id. at 525, 107 S.Ct. 828.
That is a far cry from what we have here. In the statement at issue, Martin never even hinted that he was willing to talk to anyone. All he said was that he would rather talk to an attorney “first.” Deputy Morath, by his actions, demonstrated that he understood just what Martin was doing. Deputy Morath properly ended his interrogation, sent Martin back to the lock-up, and prepared to go home. An explanation even more plausible than the one the majority finds “clear” is that Deputy Morath’s request for a written statement alerted Martin to the fact that he was in real trouble: the interrogation was getting serious, and Martin needed the assistance of counsel. This is exactly the way that our colleagues in the Second Circuit interpreted a comparable exchange. In United States v. Quiroz, 13 F.3d 505, 512 (2d Cir.1993) (citing Barrett, 479 U.S. at 529, 107 S.Ct. 828, overruled on unrelated grounds by United States v. Plugh, 648 F.3d 118, 126 (2d Cir.2011)), the court found that by “[Booking only at Quiroz’s initial statement that he wished to consult with counsel before signing, we do not see any intended limitation, for that statement was a direct and complete response to the precise question Quiroz had been asked” (emphasis added). That is, *692 the Quiroz court found that an invocation of a right to counsel in response to a direct question about signing something was an across-the-board assertion of the accused’s rights. We should follow the Second Circuit’s lead in Quiroz and recognize here that Martin, by refraining from saying anything about his willingness to talk in a limited way, placed no limits on his invocation of his rights to remain silent and to receive assistance of counsel.
The majority asserts that “[t]o conclude that [Martin] invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [Martin’s] statement.” But this loses sight of what Martin said — and of what he did not say. As I have already stressed, in Barrett, the accused unambiguously and affirmatively consented (three times) to providing oral statements. Nothing of the sort happened in our case. The majority must rest its decision on the thin reed of the final four words in Martin’s statement: “before I do that.” Do what? Sign a written statement? Talk more? If we are to look at context, then the majority cannot limit its view to Deputy Morath’s question; it must also take into account his immediate response to Martin’s request, which was to cease interrogation. Looking at everything that was happening at the time Martin made that statement, it is no disregard at all of the “ordinary meaning” of Martin’s words to find that he placed no limits on his invocation of his right to counsel.
The majority’s rule reverses the presumption reflected in Barrett, under which a partial waiver of rights exists only if the accused affirmatively spells out what he will discuss and what he will not. In so doing, it calls for a result different from the one that the Supreme Court itself reached in Edwards, where the request for counsel was conditionally phrased. Recall that after the officer there told Edwards that he had no authority to make a deal, Edwards stated that he “want[ed] an attorney before making a deal.” 451 U.S. at 479, 101 S.Ct. 1880 (emphasis added). The next morning, two officers returned and elicited a confession from Edwards. Under the standard adopted by the majority, that second interrogation would have been permissible: Edwards’ request would be limited to conversations about a deal and would not have reached anything about the events underlying his arrest.
The majority also relies on the fact that after the impermissible resumption of his interrogation and the repetition of the Miranda warnings, Martin agreed to talk to the Burlington detectives. This, they believe, “supports] the inference that Martin was willing to speak with authorities.” Ante at 689 n. 4. Although the opinion acknowledges that this evidence cannot be used to establish that Martin waived his right to counsel, id., this does not go far enough. In fact, as Edwards holds, it is impermissible to rely on anything Martin said during the second phase of his interrogation. And Edwards does not stand alone. In Smith v. Illinois, 469 U.S. 91, 100, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the Supreme Court stated that “postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request” (emphasis in original). Applying Smith to Barrett, the Second Circuit found that “response[s] to [the police’s] subsequent inquiry as to whether [the defendant] would answer questions orally cannot be used to determine whether his initial response was limited.” Quiroz, 13 F.3d at 512; see also Robinson v. Borg, 918 F.2d 1387, 1391 n. 4 (9th Cir.1990).
Last, the majority’s opinion deals only cursorily with the fact that it is the government’s burden to prove Martin waived *693 his right to counsel. J.D.B. v. North Carolina, — U.S. -, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011). This is important for two reasons. First, it means that ties go to Martin, not to the prosecution. As footnote 2 in the majority’s opinion concedes, there is still some question about what exactly Martin said. Ante at 687 n. 2. Second, the majority suggests that Deputy Morath left the interrogation room because he had reached the “conclusion of the interview,” but as it acknowledges, it is equally likely that he ended the conversation because “Martin requested an attorney.” Ante at 689. We must take the defendant’s statements “as ordinary people would understand them,” Barrett, 479 U.S. at 529, 107 S.Ct. 828, and in that light (as I have already noted), Deputy Morath’s own reaction to Martin’s statement is instructive. Upon hearing Martin’s response, Deputy Morath did not drop the suggestion of a written statement and continue with the oral interrogation. He immediately ceased all interrogation without regard to its form. To the extent that the record does not contain enough information to resolve whether Deputy Morath left because he was finished or because of Martin’s request for an attorney, it is the government that bears the risk of uncertainty. There is nothing (except Martin’s postrequest statements, which we all agree are out of bounds) to show Martin’s intent to selectively waive his right to counsel.
Because Martin never affirmatively stated that he was willing to continue to talk to the officers, because the record shows that Deputy Morath realized that Martin wanted interrogation to cease until an attorney arrived for him, and because the majority attributes meaning to Martin’s statement that it cannot bear, I respectfully dissent.